**BURNS BROS v. ERIE R. CO. et al.**
**PALMER et al. v. BURNS BROS. NO. 77
et al.**

**THE TRANSFER NO. 7.**
Nos. 17576, 17850.

United States District Court
E. D. New York.

June 1, 1948.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for libelant and respondent Burns Bros.

Hagen & Eidenbach, of New York City (Charles Hagen, of New York City, of counsel), for respondent Erie R. Co.

John J. McElhinny, of New York City, for respondent Central R. Co. of New Jersey.

Burlingham, Veeder, Clark & Hupper, of New York City (George R. Wagner, of New York City, of counsel), for respondent Long Island R. Co.

Edward B. Brumley, of New York City (Robert Peet, of New York City, of counsel), for respondent and libelant Howard S. Palmer, and others.

KENNEDY, District Judge.

The owners of the coal barge Burns Bros. No. 77 (which I will call No. 77) [1] have filed their libel against Erie Railroad Company (Erie), Long Island Railroad Company (Long Island), Central Railroad Company of New Jersey and its trustees (Central), and New York, New Haven and Hartford Railroad Company and its trustees (New Haven). The suit is strictly in personam.

New Haven has filed a libel in a cause of salvage in rem and in personam against the barge No. 77 and her owners. The two suits have been consolidated by order and were tried together.

On Easter Sunday, April 1, 1945, at 3:00 o'clock in the afternoon, the bargee of No. 77 left her properly moored at the bulkhead at 36th Avenue, Long Island City. She had arrived at that point laden with 594 tons of coal, but all had been discharged except about 50 or 60 tons. The starboard side of No. 77 was toward the bulkhead; she had about 9 feet of free board.

At 10:50 p. m. on the same day New Haven's tug Transfer No. 7, towing on her port side the covered barge New Haven No. 124, picked up the coal barge in a sinking condition in the East Channel of the East River, quite near the northerly limit of Rainey Park, and beached her bow first at a dock at the foot of Broadway.

No. 77 had sustained considerable damage to her stern. Her lines had all been parted. Her starboard stern quarter cleat was up-ended, and there was a hole in her port bow. This physical damage to No.

77 could all be accounted for by a violent blow at the stern which would have the effect of canting her around and driving her port bow into the cribbing ahead of her and near the dock where she lay.

Just prior to 8:50 p. m. [2] on April 1, 1945, seven carfloats were moored to the No. 1 rack at Long Island City belonging to respondent Long Island. They were all moored along the north side of the rack with the bow or toggle end in toward the Long Island shore and the stern or bumper end out toward the river. Counting from the rack outward (northerly) in the tier, the carfloats appeared to have been moored in this way: Central Railroad No. 35, Central Railroad No. 42, Lehigh Valley 2003, Pennsylvania 566, Long Island No. 20, Erie 45, and Erie 41. Some at least of the floats had railroad cars on board.

Between 8:50 p. m. and 9:45 p. m., four "drilling" operations were carried out. At 8:50 p. m. Lehigh Valley 2003 was taken out by the tug Slatington, Pennsylvania 566 was taken out by the tug Meitowax, and Erie 45 by the tug Scranton. At 9:45 p. m. Erie 41 was taken out by the tug Rochester. In each case the tug was in the same ownership as the float taken.

The "drilling" operation needs further description. Normally the tug comes up to the stern of the float to be taken, and the fasts are cast off usually by employees of Long Island, helped by the crew of the tug. The tug then hauls the float stern first out into the river, ultimately making up alongside it for towage from that point.

It can be seen that this operation entails breaking the tier. To guard against trouble on this score, Long Island employs what is called a "holding-up" tug, in this case the Patchogue. As soon as a float had been drilled out of the tier, it was the duty of Patchogue to shove the outside floats back into contact with those still made fast to the rack, and moor the former to the latter.

But in some instances, as happened here, the float to be taken may be the end (in this case the most northerly) float. This

---

[1] Her dimensions are length 100 feet, beam 25 feet, and depth 13 feet.

[2] All times given are Eastern War Time.

was the situation when at 9:45 p. m. on April 1, 1945, the tug Rochester arrived to take Erie No. 41. In that situation, probably with the object of saving time, the tug comes up along the off-shore side of the float to be removed, puts out head lines, stern line and strap, breaks the carfloat out of the tier, and then proceeds on her way. It can be seen that this operation, even though carefully conducted, puts a strain on all of the fasts, because the carfloat being taken out may be canted in one direction or another, and the movement may cause the whole tier to surge. The whole operation is very much like a game of musical chairs, but a good bit rougher.

At about 10:00 p. m. those in charge of No. 1 rack became aware of the fact that the lines between Central No. 42 and the in-shore float (Central No. 45) had parted. Long Island No. 20 was, as the result of the shifting operations I have already described, then made fast to Central No. 42. The two carfloats then whirled up the East Channel under the impetus of the flood tide (1.5 knots) and a southwest wind of very nearly gale force (27 miles per hour).

At the time the floats broke away, Patchogue, the "holding-up" tug, was down at what is known as the Pine Dock removing Erie 37. The Pine Dock is somewhat to the southward of No. 1 rack. An alarm had been blown by Long Island's dispatcher. When the alarm was blown, the master of Patchogue had Erie No. 37 in tow and was being aided by the tug Long Island. The tug Meitowax was "holding up" for Patchogue at the Pine Dock.

Immediately upon hearing the alarm, Patchogue turned her tow over to the tug Long Island and set out in pursuit of the derelict carfloats, followed by Meitowax. As Patchogue passed a point which her master fixed as just off 40th Avenue, Long Island City, he saw one of the carfloats (unquestionably Central No. 42) strike a moored coal barge. The point of collision, according to Patchogue's master, was 1,-500 feet to the southward of 36th Avenue, where No. 77 was moored. I mention this circumstance here because perhaps the principal question litigated at the trial was whether libelant had sufficiently established that its coal barge, and no other, was struck by the derelict carfloat. I will return to the point later.

After the collision between the carfloats and the coal barge, the floats broke adrift from each other. Patchogue ultimately (10:45 p. m.) picked up the float Long Island No. 20. Meitowax managed to secure Central No. 42 off Jamaica Avenue, Astoria, at 10:55 p. m. By that time both floats had progressed to the northward of Nallet's Cove. Calculations by an expert on tidal data show that the points and times where the floats were secured are quite consistent, under the given conditions of wind and tide, with the hypothesis that they broke their moorings at 10:00 p. m. It was around the time that the floats were eventually secured that New Haven's tug Transfer No. 7 secured libelant's barge and beached her, as I have already described.

■ Further discussion can be simplified if I say at this point that there is not in the evidence the slightest basis for a charge of fault against either respondent New Haven or respondent Erie in the collision suit. New Haven had no part in the disaster except to salvage libelant's barge. Erie, it is true, warped out the offshore carfloat (Erie No. 41) about 15 minutes before the inside carfloats broke loose (9:45 p. m.). But there was credible testimony from the master of Patchogue that Rochester, Erie's tug, conducted the drilling operation in a normal acceptable manner, and no evidence to the contrary. Therefore, a charge of fault against this respondent (Erie) would be founded on nothing but sheer speculation.

In fact, it is impossible to say with any confidence exactly what caused the lines between Central No. 42 and Central No. 35 to part. The evidence is to the effect that the lines of Central No. 42, after she was picked up, showed no signs of undue wear, and seemed to be able to withstand normal strains at least, for after the float had been rescued, she was moored safely with those same lines. One is tempted to suggest that the wind had something to do with the parting of the lines, because at

9:55 p. m., Eastern War Time, its velocity increased appreciably. But on the whole, I could not find as a fact what precisely caused Central No. 42's fasts to part. And so far as Erie is concerned, this would necessarily lead to a decree dismissing the libel. In fact, at the trial Erie put in no case at all, although its witnesses were present in court and its advocate invited the libelant to call them.

There are, however, some phases of the case about which one can be fairly certain. There can be no doubt, or at least there is none in my mind, that libelant's barge was broken from her moorings because Central No. 42 collided violently with the after portion of the coal barge. The master of Patchogue saw such a collision. True enough, he placed it 1,500 feet from No. 77's moorings. But that, under the circumstances, I regard as a minor discrepancy. No other coal barge was adrift in the river that night. Moreover, the physical evidence, that is to say the damage to libelant's barge, points to just such a collision as Patchogue's master saw as the cause of the disaster. That being so, the next question is who, if anyone, is to be held responsible.

Counsel in the briefs devoted considerable attention to a law point, namely, whether Long Island was a bailee for the carfloats belonging to other railroads. It was libelant's position that such a relationship, at least between Central and Long Island, is established by the cases (notably the Talisman, 1933, 288 U.S. 239, 53 S.Ct. 328, 77 L.Ed. 721; Palmer v. Agwilines, Inc., 2 Cir., 1943, 135 F.2d 689; Seaboard Sand & Gravel Corporation v. Moran Towing Corporation, 2 Cir., 1946, 154 F.2d 399). Respondent Long Island urges that it receives but a nominal sum for the service which it renders to the other railroads in respect of the carfloats, and should not be held to the liability of a bailee. But I think the status of Long Island need not be determined, at least by me.

■ The reason, and the only reason, libelant argues so strongly that a bailment came into existence is the belief, which I believe to be a mistaken one, that if a bail-ment be established, libelant can claim the benefit of some sort of "presumption". But it seems to me that where bailed property, assuming Central No. 42 to be such, inflicts damage on the property of a third party, the latter must prove negligence step by step, and can claim no "presumption" which will take the place of proof. The presumption, if there is any, might be claimed by Central, but certainly not by a stranger to the bailment. At least so I read In re Pennsylvania R. Co., 2 Cir., 1931, 48 F.2d 559. I should think that in this case libelant occupies a position analogous to that of the City of Long Beach in the case just cited, while the position of respondent Long Island is quite similar to that of the railroad company in the same case. I acknowledge that the analogy is not perfect. But Judge Learned Hand in that case (48 F.2d 559, 564) certainly approaches a similar problem of liability as if it were unaffected by any presumption.

■ Despite this, I believe Long Island was at fault, that its fault was a proximate cause of the damage to libelant's barge, and that libelant established the negligence of respondent Long Island by the preponderance of the evidence. I say this because there was surely a causal connection between the departure of the "holding-up" tug Patchogue on another assignment, the break in the tier, and the damage inflicted by the drifting carfloat. It may well be that in offering its facilities Long Island was merely performing a duty imposed upon it by law (The Talisman, supra) and that the compensation it receives is by no means adequate for the service required. But a moment's consideration of the position will show that the drilling operation is so inherently dangerous as to require the constant presence of a "holding-up" tug. And this is true no matter how carefully the drilling tugs and the floats are maneuvered. It is not to be forgotten that the traffic in the East Channel of the East River is apt to be heavy and the spectacle of two huge carfloats whirling up the channel out of control is a grim one. The respondent's responsibility is, as in other situations, to be measured by the gravity of the risk that these carfloats may go

adrift, by the foreseeable consequences to others if they do, and by the burden required to avert the risk. I see no room whatever for doubt that the "holding-up" tug should never depart from its station. If Patchogue had stayed where she belonged on the evening of this occurrence, in all likelihood no damage would have been caused.

■ The same standards are to be applied in dealing with the responsibility of respondent Central. Had a suit in rem been possible, liability would have been automatic. But such a suit was apparently not possible, for an order of the District Court of New Jersey prevented the arrest of carfloats belonging to respondent Central (order of October 30, 1939, In the Matter of Central Railroad Company of New Jersey, D.C. N.J.). But, I believe that respondent Central and its trustees are liable on in personam principles for the damage to the coal barge, jointly with respondent Long Island.

I need not repeat what I have said about the extremely dangerous character of the handling of carfloats at these racks and bridges. I acquit Central of any fault in respect of mooring lines. It may well be that libelant could be given the benefit of a presumption of defective lines, and also of a presumption of negligence arising from the fact that the collision was between a drifting carfloat and a stationary barge. But these presumptions become unimportant in the light of the fact that concededly no servant of Central was at any time on board the carfloat which eventually broke loose. That being so, I can see no escape from the conclusion that Central was at fault, United States v. Carroll Towing Co., 2 Cir., 1947, 159 F.2d 169, 174. Had an alert caretaker been stationed on the float, I have little doubt that the disaster would have been averted. Whatever the cause, the parting of the lines must have been accompanied by a loud report, and in all likelihood there was sufficient time after they parted for even a mediocre deckhand to replace them.

■ As for the cause of salvage, libelant New Haven is clearly entitled to an award. I think this should be in the amount of $500 to be divided as follows: $100 to the owners, $100 to the master of Transfer No. 7, and $50 to each of the six members of the crew. There was at risk property valued by agreement at $82,000 (Transfer No. 7: $75,000; New Haven No. 124: $7,000). After the disaster the value of the salvaged coal barge was $1,000. But the risk was fairly considerable when one considers that the carfloats were berserk at the time of the salvage operations. And there was some interruption, even though brief, in the towage operation on which Transfer No. 7 was engaged.

■■ Nobody has suggested the point, but it seems to me that the salvage award and the costs of the salvage suit, including the cost of bail, should be elements of libelant's damage. It has been stated as a general proposition (Marsden's Collisions at Sea, 8th Ed., p. 125) that salvage is recoverable from the offending vessel in a collision case (citing The Linda, 1857, Swab 306; The Diana, 1874, 2 Asp. M.C. 366; The Williamina, 1878, 3 P.D. 97, 99), and it is also said that the costs of the suit and expenses of bail are part of the consequential damage. In a case not too dissimilar in some respects to this one (American Sugar Refining Co. v. City of New York, 2 Cir., 1929, 33 F.2d 97) Judge Chase, without discussing the point, specifically mentions that salvage is to be paid by the wrongdoer. I am not clear whether the wrongdoer in that case was also the owner of the salved barges and, if so, whether that makes any difference. But I am confident that the cost of salvage was here a direct consequence of the faults of respondents Long Island and Central, and should be imposed upon them.

The libel against New Haven is dismissed without costs, and New Haven, in the cause of salvage, is entitled to a decree with costs in accordance with this opinion. The libel against respondent Erie is dismissed without costs.

Libelant is entitled to a decree with costs in the usual form against respondents Long Island and Central jointly

I have filed findings of fact and conclusions of law.