Petition of J. E. BRENNEMAN COM-
PANY For Exoneration From or
Limitation of Liability.

J. E. Brenneman Company, Appellant.

No. 13983.

United States Court of Appeals
Third Circuit.

Argued Dec. 13, 1962.

Decided Aug. 15, 1963.

Rehearing Denied Sept. 13, 1963.

See also 312 F.2d 271.

Joseph J. Murphy, Philadelphia, Pa. (Thomas F. Mount, Rawle & Henderson, Murphy & Sheehan, Philadelphia Pa., on the brief) for appellant.

Abraham E. Freedman, Philadelphia, Pa. (Charles Sovel, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief) for appellees.

Before KALODNER and FORMAN, Circuit Judges, and ROSENBERG, District Judge.

FORMAN, Circuit Judge.

This is an appeal, under 28 U.S.C. § 1292(a) (3), by J. E. Brenneman Company (Brenneman) from an interlocutory judgment of the United States District Court for the Eastern District of Pennsylvania [1] denying its petition for exoneration from or limitation of liability [2] for damages as a result of a fire on July 20, 1956 involving its barge "Hercules", the pier to which it was moored and other property.

The petition was challenged by the following claimants:

(1) Eastern Gas & Fuel Associates [3] and Philadelphia Coke Company (for convenience hereafter collectively referred to as Coke Company), the owners and operators of a coke manufacturing plant, pier and equipment, located on the Delaware River in Philadelphia, Pennsylvania, alleging that they sustained damages to their property to the extent of $171,619.92 by reason of the negligence of Brenneman and the unseaworthiness of the "Hercules" whereby the fire started aboard it and was communicated to the pier causing damage to it, their plant, equipment, machinery, business and operations.

(2) Patterson Oil Company and Patterson Terminals, Inc., which maintained two petroleum product pipe lines on the pier, alleging damage to them in the sum of $1,070 on the same basis as charged by the Coke Company.

(3) S. W. Kooperman, Inc., owner of sand blasting and painting equipment deposited on the Coke Company's pier for use in work on the aforementioned pipe lines, alleging damage to it in the sum of $3,986.05, also on the same basis as charged by the Coke Company.

It is undisputed that for several weeks prior to July 20, 1956, Brenneman's employees were engaged in repairing the pier of the Coke Company, 520 feet long and 44 feet wide,[4] pursuant to a contract between them. As an incident to the repair operation Brenneman utilized its barge the "Hercules", approximately 54 feet long, 23½ feet wide and 5 feet in

---

1. Judge Caleb R. Layton III of the United States District Court for the District of Delaware sat for the trial under special assignment. His findings of fact, conclusions of law and memorandum opinion are unreported.

2. 46 U.S.C. § 181 et seq.

3. At the time of the fire, Eastern Gas and Fuel Associates, a Massachusetts trust, owned all of the stock of the Philadelphia Coke Company, a corporation of Pennsylvania. Subsequently, Philadelphia Coke Company was dissolved and all of its assets were transferred to Eastern Gas & Fuel Associates, from which time it has been operated as a division of Eastern Gas & Fuel Associates.

4. The pier was "constructed of wood decking supported by rows of pilings. The rows of pilings are approximately 10 feet apart and are referred to as bents. The bents are numbered consecutively from 1 to 52 proceeding from the inshore to the offshore end of the pier. At 13, 26 and 39, there are fire walls underneath the pier consisting of planking extending from just underneath the top decking to below the low water mark. On the top of the pier there is a coal unloading tower and a barge loader which move on tracks extending the length of the pier. In addition, there is a conveyor belt extending down the center of the pier from the aforesaid equipment to the company's outdoor storage yard inland from the pier." Finding of Fact No. 5.

848

depth, with a free board of approximately 2 feet. Pile driving equipment was mounted on its bow. Aft of it was a house 25 feet long, 16½ feet wide and 13½ feet high at the peak of the roof, which contained equipment used in the conduct of its business. Its walls were made of "German" siding, and had fire resistant, insulating material on the inside. The barge was without motive power and was towed from place to place where it was to function.

Before concluding work at 4:30 P.M. on July 19, 1956, employees of Brenneman tied the "Hercules" with its bow toward the river at a point approximately two-thirds from the river end of the pier. A float stage about 5 feet wide and 40 feet long separated the side of the "Hercules" from the side of the pier.

Brenneman employed a watchman on the "Hercules" to work a split shift which ran from 4:30 P.M. to 6:00 P.M.; from 7 P.M. to 10:30 P.M. and then from the following 4:30 A.M. to 7:30 A.M. His job was to guard the "Hercules" and prevent theft and fire.

At about 1:15 A.M., on July 20, 1956, an employee of the Coke Company, stationed in the cab of a traveling crane about 35 feet in the air and one quarter mile away, observed flames issuing from the top of the house on the "Hercules". Coke Company's employees endeavored to extinguish the fire with the company's hose. Meanwhile an alarm was given and the Philadelphia Fire Department responded with apparatus and fought the fire until it was ended. The "Hercules", the pier and the property on it were seriously damaged by the fire.

Among others, the District Court made the following findings of fact:

"19. The fire originated on the 'Hercules' and was transmitted to the pier from the vessel. It was transmitted to the pier by some force set in motion by the escaping air from the air tank.

"20. At all times material hereto, the 'Hercules', and its gear and appurtenances, were in the exclusive control of petitioner. Accordingly, it is inferred that the fire started by reason of petitioner's negligence.

"21. Reasonable care, under all the circumstances, required petitioner to maintain an all night watch on the 'Hercules', to prevent fires, to properly maintain mooring lines; to prevent the barge from breaking away from its moorings and other similar purposes.

"22. There is a custom in the port of Philadelphia of maintaining watchmen on board vessels such as the 'Hercules' during the entire night."

*  *  *  *  *  *

"24. The fire of July 20, 1956, caused damage to the property of claimants, Philadelphia Coke Company, Patterson Oil Company, Patterson Terminals, Inc. and S. W. Kooperman, Inc."

*  *  *  *  *  *

"26. Petitioner was negligent in failing to maintain an all night watchman on the barge under general principles of negligence and for failure to conform with the practice in the port, with which negligence petitioner was in privity."

The District Court made the following conclusions of law, among others:

"1. The fire on the coal pier of the Philadelphia Coke Company on July 20, 1956, started by reason of the negligence of petitioner and/or its employees.

"2. The exercise of reasonable care required that petitioner maintain a watchman aboard the 'Hercules' during the entire night. Its failure to do so constituted negligence and rendered the vessel unseaworthy and said negligence and unseaworthiness was a proximate cause of the spread of the fire to the pier.

"3. Petitioner had actual knowledge that no watchman was on duty from 10:30 P.M. to 4:30 A.M. and, therefore, was in privity to the

aforesaid act of negligence and unseaworthy condition."

\* \* \* \* \* \*

"5. Petitioner is not entitled to exoneration from liability against any of the claimants by reason of its negligence in causing or permitting the fire to take place.

"6. Petitioner is not entitled to exoneration from liability against any of the claimants by reason of its negligence and the unseaworthiness of the 'Hercules' in that there was no watchman aboard the vessel.

"7. Petitioner is not entitled to limitation of liability against any of the claimants because of its privity in the negligent act and the unseaworthy condition existing by reason of the failure to have a watchman aboard the 'Hercules'."

The District Court supplemented its findings and conclusions with a memorandum opinion.

As to the origin of the fire the District Court concluded that the theories of the experts [5] were to be given little or no weight "for the simple reason that there was ample reliable, impartial, eye-witness testimony to support the conclusions \* \* \*" that the fire originated on the "Hercules" and not on the pier. It concluded that the petitioner had fallen far short of sustaining its burden of proof and was not entitled to exoneration.

On the issue of limitation the District Court analyzed the evidence dealing with the petitioner's failure to have an all night watchman aboard the "Hercules" and summarized its determination as follows:

"From the foregoing, there seems to be sufficient evidence to establish a custom of the Port of Philadelphia to the effect that barges are manned by night watchmen, one of the reasons being to guard against fire. Accordingly, the failure of the petitioner here to have a watchman all night may be regarded as negligence. Indeed, many cases seem to hold as a matter of law without proof of custom that failure to man a barge with a night watchman is negligence. See United States v. Carol Towing Co., 159 F.2d 169 (2d Cir.); Burns Bros. v. Erie R. Co., [D.C.] 79 F. Supp. 948. But it is not necessary to go so far here because of the testimony just considered. Clearly there was privity and Limitation will be denied."

Accordingly an interlocutory decree in favor of the claimants was entered, denying the petition of Brenneman for exoneration from, or limitation of, liability and directing that the matter proceed to a determination of the question of damages.

5. The District Court characterized the theory of the origin of the fire as expressed by Brenneman's expert witness, Alfred Ellis Baccini, thus:

"When the coal dust, which had accumulated in considerable quantity in the cracks between the planking and on the caps and between the stringers, became ignited and began to spread, at this point the fire was a glowing one rather than being a flame, as the layers of coal dust carried the fire throughout the pier areas, like the tentacles of an octopus. Gradually, larger and larger areas of this wooden creosoted pier became involved beneath the deck planking and began to heat up. As the heat increased, the wooden timbers began to give off flammable gases in increasingly larger amounts until the flame was great enough to cause the gases to ignite and to break into

flame. There would be no smoke in connection with this type of fire, which, according to Baccini, started from spontaneous combustion, and this accounts for its not being detected sooner. The creosoting on the pier, depending on when applied, would tend to accelerate the fire after the ignition had taken place."

It then questioned this theory rhetorically and concluded:

"How then, may it be asked, could such a fire containing little or no flame have been transmitted from underneath the pier about 6 ft. horizontally so as to ignite the *inside* of the house which was aflame (but not the pier) when impartial witnesses arrived?

"This conclusion of Mr. Baccini's would be entitled to respect if there had been no eyewitnesses but under the circumstances is untenable. \* \* \*"

Brenneman takes this appeal from the interlocutory decree asserting that the findings and conclusions are in error.

Preliminarily, during the trial Brenneman raised the question that if the claimants had been paid by their own insurers for their losses occasioned by the fire they could not be heard to contest the petition for exoneration and limitation. It urged that they would not be the real parties in interest, and in admiralty an action may only be brought or contested by the real parties in interest. The claimants contended that payments received from their insurers were for loan receipts. The factual evidence underlying these contentions was not available in the record and it was felt that such a threshold issue should be treated first. Accordingly, an order was made granting leave to supplement the record herein, by producing before the District Court evidence as to the propriety of the claimants as real parties in interest and to lodge the transcript thereof with this court.[6]

The supplemental proofs were submitted to the District Court from which it made further findings of fact and conclusions of law. The District Court found that the claimant S. W. Kooperman, Inc. was not insured for its loss sustained in the fire and has not been compensated therefor; that the claimants Patterson Oil Company and Patterson Terminals, Inc. were insured by the Fire Association of Philadelphia and following the fire they received the amount of $1,070 as a loan from said insurance company, giving it in return a loan receipt executed by the Patterson Oil Company in the typical form attached hereto as an appendix. It further found that the claimants Philadelphia Coke Company and Eastern Gas & Fuel Associates carried insurance in three different categories—blanket fire insurance which

covered the pier, inland marine insurance on the equipment on the pier, and business interruption insurance; that following the fire the said claimants received as loans from their insurers, in each category, the amounts claimed in their proofs of loss,[7] that these advances were represented by loan receipts executed by the Philadelphia Coke Company in return for the respective amounts claimed and that each loan receipt was also similar to the typical form in the appendix.

The District Court concluded that the claimants are the real parties in interest in this litigation.

Since S. W. Kooperman, Inc. has no insurance or compensation for loss it is beyond dispute that it is a real party in interest.

However, as to the other claimants, Brenneman urges that if each insured was paid his claim in full according to his proof of loss[8] the insurer is the real party in interest notwithstanding the characterization of the payment as a loan receipt transaction.

In Luckenbach v. W. J. McCahan Sugar Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170 (1918) the Supreme Court considered the propriety of a suit by a shipper, in its own name against the ship, its charterer and owner for the loss of its cargo. The charterer and the owner sought dismissal of the libel because the shipper had already been compensated for the loss by insurance.

The bills of lading contained a clause providing that the carrier shall, to the extent of its liability, have the full benefit of any insurance that may have been effected upon the cargo. The policies under which the shipper was insured provided that the insurer was "free from any liability * * * for merchandise shipped under a bill of lading containing

---

6. In the Matter of the Petition of J. E. Brenneman Company, 312 F.2d 271 (3 Cir., 1963).

7. The supplemental hearing disclosed that the Coke Company and Patterson Oil Company had received advances of the entire sums submitted in their proofs of loss. However, both contend that their actual damage exceeded the amounts in the proofs of loss.

8. See note 7, supra.

a stipulation that the carrier may have the benefit of any insurance thereon."

The Court described the situation thus:

"\* \* \* The carrier (including in this term the charterer, the ship, and the owners) would, in no event, be liable to the shipper for the damages occasioned by unseaworthiness, *unless* guilty of negligence. The insurer would, in no event, be liable to the shipper, *if* the carrier was liable. In case the insurer should refuse to pay until the shipper has established that recovery against the carrier was not possible—prompt settlement for loss (which is essential to actual indemnity and demanded in the interest of commerce) would be defeated. If, on the other hand, the insurers should settle the loss, before the question of the carrier's liability for loss had been determined, the insurer would lose the benefit of all claims against the carrier, to which it would be subrogated in the absence of a provision to the contrary in the bill of lading, The 'Potomac,' 105 U.S. 630, 634 [26 L.Ed. 1194]; and the carrier would be freed from liability to any one." 248 U.S. at 146–147, 39 S.Ct. at 54–55, 63 L.Ed. 170.

To save the shipper the deprivation of the immediate use of the money to which it was entitled, either from the insurer or the carrier and so that the insurer should not lose the right of subrogation, an agreement was entered into by the shipper acknowledging the receipt of money for its loss, as a loan, repayable only to the extent of any net recovery it made from the carrier on account of its loss or from any insurer of the carrier. The shipper pledged to the insurer the recovery and agreed to prosecute suit against the carrier with diligence at the expense and under the control of the insurer. Upon the delivery of the agreement the shipper received the amount of its loss. It promptly filed a libel in its name for the use of the insurer.

The Court rejected the carrier's contention that the transaction, while in terms a loan, was in substance a payment of insurance and that to give it effect as a loan was to sanction subterfuge and fiction. It found no good reason for questioning the legality of the transaction or for denying its effect. Indeed, it found it "creditable to the ingenuity of business men that an arrangement should have been devised which is consonant both with the needs of commerce and the demands of justice."

The loan receipt in the instant case differs in no important respect from the agreement in Luckenbach, and the distinctions sought to be drawn by Brenneman as to other circumstances are not material. Since we are dealing with the application of Luckenbach to the circumstances of this case, we need not be disturbed at the dire results which Brenneman predicts would follow such application to the variety of coverages listed by it which are subject to subrogation but are not before us here.

Brenneman, also, in effect, contends that approval by the Court of the procedure in Luckenbach has been repudiated in United States v. Aetna Casualty & Surety Co., 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949). There the Court considered the question of whether an insurance company may bring a suit in its own name against the United States under the Federal Tort Claims Act,[9] upon a claim to which it has become subrogated by payment to an insured who would have been able to bring such an action. Three cases were involved, each presenting a slightly different aspect of the problem. They turned on the application of the provisions of the Anti-Assignment Act, R.S. 3477, 31 U.S.C.A. § 203, concerned with assignments of claims upon the United States and Rule 17(a) of the Federal Rules of

9. 60 Stat. 842, formerly codified as 28 U.S.C. § 931 et seq.; see United States v. Aetna Surety Co., 338 U.S. at 367 n. 1, 70 S.Ct. at 208, 94 L.Ed. 171.

Civil Procedure, which provides that every action shall be prosecuted in the name of the real party in interest. Objections urged by the Government that the insurance companies who had paid their insureds in whole or in part were not the real parties in interest or entitled to sue as subrogees were rejected and the Court held:

"* * * If the subrogee has paid the entire loss suffered by the insured, it is the only real party in interest and must sue in its own name, 3 Moore, Federal Practice (2d ed.) p. 1339. If it has paid only part of the loss, both the insured and the insurer (and other insurers, if any, who have also paid portions of the loss) have substantive rights against the tort-feasor which qualify them as real parties in interest." 338 U.S. at 380–381, 70 S.Ct. at 215–216, 94 L.Ed. 171.

Aetna deals with the subject matter entirely different from the effect of the loan receipts involved herein. Brenneman's arguments in large part parallel the discussion in the dissenting opinion in Peoples Loan & Finance Corporation v. Lawson, 271 F.2d 529 (5 Cir., 1959). But the majority in that case held reliance on United States v. Aetna Casualty & Surety Co., supra, to be entirely misplaced "because that suit had to do only with the Anti-Assignment Act, R.S. 3477, 31 U.S.C.A. § 203, and because there no loan receipt was involved,

* * *." The same conclusion is to be drawn in this case.

On the authority of Luckenbach this court has heretofore sustained in the status of an insurer as the real party in interest in similar loan receipt transactions. Automobile Ins. Co. of Hartford, Conn. v. Springfield Dyeing Co., 109 F.2d 533 (3 Cir., 1940); The Plow City, 122 F.2d 816 (3 Cir., 1949); see also Capo v. C–O Two Fire Equipment Co., 93 F.Supp. 4 (D.N.J.).[10]

As determined by the District Court, S. W. Kooperman, Inc., Eastern Gas & Fuel Associates, Philadelphia Coke Company, Patterson Oil Company and Patterson Terminals, Inc. are the real parties in interest herein.

■ This appeal presents vigorous attacks upon the findings of fact by the District Court. We need not stress the elementary rule that the credibility of the witnesses is for the trier of fact and that findings of fact of the Trial Judge are not to be disturbed by this court unless they are clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Petition of Oskar Tiedemann & Co., 289 F.2d 237, 240 (3 Cir., 1961); M. W. Zack Co. v. S. S. Birmingham City, 311 F.2d 334, 337–338 (2 Cir., 1962).[11]

Turning to the finding that the fire in this case originated on board the "Hercules" and was transmitted to the pier, which Brenneman strongly disputes, the record discloses, among other things, that

10. The same conclusion is reached where the validity of loan receipt transactions is questioned under Pennsylvania law. See the discussion of this problem in the context of adding a necessary party in Watsontown Brick Co. v. Hercules Powder Co., 201 F.Supp. 343 (M.D.Pa.1962). See also 3 Moore Federal Practice, p. 1349.

11. In M. W. Zack Co. v. S. S. Birmingham City, 311 F.2d 334, 337–338, it is stated that:
"* * * [T]he scope of our powers of review are not unlimited. While this is a case in admiralty, the 'clearly erroneous' principle embodied in Federal Rule of Civil Procedure 52(a) is applica-

ble. McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20. A fair statement of the rule is that we may not set aside a finding of fact unless we are left with the 'definite and firm conviction that a mistake has been committed,' United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, and that we will reverse 'most reluctantly and only when well persuaded.' United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 433. We must respect the evaluation of credibility made by the trial judge of the witnesses present before him. Broadcast Music, Inc. v. Havana Madrid Restaurant Corp., 2 Cir., 1949, 175 F.2d 77, 80. * * *"

of the employees of Coke Company, on duty at its premises the night of the fire, four—John Hutt, electrician; Stanley Birinski, tower operator; Thomas Pawlowski, boiler house fireman, and Louis Neff, foreman—testified that they saw the house on the "Hercules" aflame an appreciable length of time before the pier began to burn. Lieutenant John A. O'Donnell, the first member of the Philadelphia Fire Department to arrive on the scene and Captain Edward F. Brecht who, with equipment under his command, responded to a later alarm, testified that the house on the "Hercules" was afire upon their arrival and that the pier was not. All testified that after the fire on the "Hercules" was being fought for about 15 minutes a sound, variously described as an explosion, an eruption and a "woosh", emanated from the house on the "Hercules" accompanied by a jet of flames which shot beneath the pier. Shortly thereafter the fire was observed coming up through the cracks of the deck of the pier and very quickly increased in intensity, to the extent that the firemen were forced to retreat toward the shore side of the pier. It was testified that the pier was not on fire until the eruption occurred and that it was the agency that communicated the fire from the "Hercules" to the pier. Testimony was also given attributing the explosion to the rupture of a tank of compressed air which was part of the equipment in the house on the "Hercules" and which was dislodged by the fire. That the tank contained air and that it was ruptured was disputed by Brenneman's witnesses. However, there was testimony that the air tank was replaced subsequent to the fire.

Brenneman depended very largely on the testimony of its fire and explosion expert, Mr. Alfred E. Baccini, who testified in substance that it was his opinion that the most probable cause of the fire was either static electricity or spontaneous combustion; that the fire originated on the pier probably as early as four o'clock on the afternoon of July 19, 1956 and that the use of sand blasting equipment and material called Insulmastic by employees of S. W. Kooperman, Inc. in painting the pipe lines which ran the length of the pier could have generated the simultaneous combustion or static electricity. It was the theory of Mr. Baccini that coal dust that had accumulated in the cracks between the planking of the deck of the pier and on the flat surfaces of supporting members underneath it became ignited and the fire, which was glowing rather than flame, spread throughout the pier areas and that hot gases arising therefrom transferred the fire to the "Hercules" by conduction.[12]

Brenneman argues that the testimony on behalf of the claimants generally was not entitled to credence, and particularly that the signed statements of the witnesses Hutt and Burinski, the employees of Coke Company, given to an investigator shortly after the fire, that they first observed it simultaneously on the "Hercules" and the pier were so inconsistent with their testimony at the trial as to render their evidence completely unbelievable.

On the other hand, it insists that the theory of its expert, Mr. Baccini, as to the nature and origin of the fire is correct and that it was convincingly corroborated by such evidence as the location, character and degree of the char found after the fire on the "Hercules", the pier, the pilings and wooden firebreak walls running crosswise at intervals underneath the pier in the vicinity of the area where the "Hercules" was moored; the Weather Bureau's record of the direction of the wind during the evening and the night of the fire and the measurement of the tide. In short Brenneman submitted that Mr. Baccini's "thesis is accurate" and that he destroyed the claimants' theory of the case.

■ The record of the trial and the rulings and findings of the District Court reveal that it acted entirely fairly in con-

12. See the District Court's understanding of Mr. Baccini's theory, supra, note 5.

sidering and weighing the evidence as submitted on each side. I was for it to appraise the effect of the inconsistencies in the witnesses' testimony and it was within its wide discretion to accept such evidence notwithstanding them. It had the advantage of seeing and hearing the witnesses. It chose to believe the Coke Company employees, particularly in the light of the support of the Philadelphia Fire Department officers whom it characterized as "impartial". Such a judgment is clearly within its province as the trier of fact. The finding that the fire originated on the "Hercules" and was transmitted to the pier is supported by substantial evidence in the record and is not clearly erroneous.

Brenneman next urges that there was no proof that it was in any way negligent. It contends that the custom in the Port of Philadelphia of maintaining an all-night watchman on such craft as the "Hercules" was not proved, hence it should not have been found negligent for violation of that practice.

The claimants called Lieutenant O'Donnell to testify, among other things, as to this custom in the Port of Philadelphia. The District Court permitted him to testify that some years before, while he was stationed aboard a patrol boat of the Philadelphia Fire Department for a period of about three years, he attended fires on approximately a dozen vessels similar in nature to the "Hercules" and that he had personally observed that it was customary to maintain all-night watchmen on such vessels. However, the District Court sustained Brenneman's objections to similar testimony of the witness insofar as it was based on information obtained by him during daylight investigations, on the ground that such testimony was no more than opinion founded on hearsay. But after the trial

the District Court reversed this latter ruling, stating in its memorandum that:

" * * * on further thought [I] am of the opinion that this testimony is admissible. When a city fire official makes numerous daylight investigations of prior large fires happening at night and in a large number of times is informed that the barge had a watchman, coupled with confirmation of the custom by personal observation in at least a dozen cases, I am of the opinion that the evidence should be admissible * *."

Brenneman not only challenges the propriety of the District Court's reversing its ruling after the evidence closed, claiming the consideration of such evidence as highly prejudicial, but also attacks the expertise of Lieutenant O'Donnell and the admissibility of his testimony based on his personal observations for the purpose of proving a custom of maintaining all-night watchmen.

We believe that the District Court's original ruling at the trial excluding Lieutenant O'Donnell's testimony as to the custom of the Port of Philadelphia based upon information received by him was correct and that this hearsay evidence was not admissible.

Additionally, we cannot affirm the finding that the custom in the Port was proved by Lieutenant O'Donnell's dozen personal observations over a period of three years.

Without more, those observations do not prove that procedure to be the invariable custom on all vessels of this nature in the Port of Philadelphia.[13] Moreover the District Court based its finding of custom on the combination of both phases of Lieutenant O'Donnell's testimony—the personal observations and the hearsay—so that we are unable to say

13. This observation is different from those that were held admissible in Napolitano v. Eastern Motor Express, 246 F.2d 249, 252–253 (3 Cir., 1957). They purported to be the personal observations of workers (not experts) of 14 and 20 years occupation directly in the work concerned

and the manner of its performance in that Port. Lieutenant O'Donnell's testimony was from the point of view of an expert fire department official, not of one engaged in the operation of a barge such as the "Hercules".

855

·whether it would have found the custom without the hearsay testimony.

■ In any event, in basing its conclusion of negligence upon the part of Brenneman on failure to observe the custom of maintaining an all-night watchman on the "Hercules", the District ·Court made too broad a determination. "Custom" is only evidence of a standard of care and violation of custom or adherence to it does not necessarily constitute negligence or lack of negligence. Northwest Airlines v. Glenn L. Martin Company, 224 F.2d 120, 129, 50 A.L.R.2d 882 (6 Cir., 1955) cert. denied 350 U.S. 937, 76 S.Ct. 308, 100 L.Ed. 818 (1956); Denning Warehouse Co. v. Widener, 172 F.2d 910, 13 A.L.R.2d 669 (10 Cir., 1949); Brigham Young University v. Lillywhite, 118 F.2d 836, 137 A.L.R.2d ·598 (10 Cir., 1941) annotated 137 A.L.R. ·611.[14] However, this is not fatal to the holding that Brenneman is nevertheless ·chargeable with negligence, as found by the District Court, on general principles.

Brenneman argues that the actual ·cause of the fire was not shown and that the record is equally void of evidence upon which the finding of general negligence could be based. Inspired by the ·decision of this court in Lebeck v. William A. Jarvis, Inc., 250 F.2d 285, 291 (3 Cir., 1957)[15] Brenneman poses the following questions:

"1. What has been the substandard conduct of the petitioner herein?

"2. How could it have foreseen this occurrence?"

■ Although, the Trial Court stated "nobody will ever know exactly how this fire started", it was convinced, as we have found not to be error, that the fire originated on the "Hercules" and was transmitted to the pier. It further found, with record support, that the "Hercules" was of wooden construction; that the house on it contained items of a readily combustible nature; and that the "Hercules" was moored to a pier constructed of creosoted wooden planking, long exposed to the accumulation of coal dust. It concluded that reasonable care under all these circumstances dictated the maintenance of an all-night watchman. As with the finding on the origin of the fire it cannot be said that these findings are clearly erroneous. Indeed, they supply rational answers to Brenneman's questions. The substandard conduct was the failure to maintain an all night-watchman under circumstances which it reasonably could have foreseen as presenting a likely fire hazard.

Brenneman further urges that it was erroneous and without basis in the record to find that failure to maintain an all-night watchman was the proximate cause of the damage. It argues that the presence of a watchman could have done little to prevent the spread of the flames to the pier in the light of the fire fighting efforts that ensued to no avail but a few minutes after the discovery of the flames. This ignores the lapse of time from the beginning of the fire until the discovery of the flames coming through the edge of the roof on the house of the "Hercules". The record discloses that the fire had

14. The often quoted statement of Mr. Justice Holmes in Texas & Pacific R. Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903) has particular application here. He said:
"* * * What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not. * * *"

15. Brenneman referred to the foregoing comment of the court:
"* * * Human life is so complex that the circumstances attending the hap-

pening of different accidents are correspondingly varied, but the principle which determines the imposition of liability is simple and constant, being based on the proposition *that one who, by sub-standard conduct, causes injury to another is legally responsible therefor if the harmful consequences of such conduct could reasonably have been foreseen.*" (Emphasis Brenneman's). Lebeck v. William A. Jarvis, Inc., 250 F.2d 285, 291 (3 Cir., 1957).

burned for a considerable period of time inside the house on the "Hercules" prior to the first observation of flames.[16] It is elementary that the first few minutes of a fire are crucial to its extinguishment. It is a legitimate inference from the facts in the record that had a watchman been on board the "Hercules" the fire could have been prevented or the alarm could have been sounded earlier and the spread of the fire to the pier avoided.

Brenneman also suggests that there is no evidence whether its watchman, Dashields, who died after the fire but before the trial, was present at the fire. However, there is no dispute as to the fact the Brenneman specifically scheduled him to be off duty from 10:30 P.M. to 4:30 A.M.[17] The conclusion drawn by the District Court that he was not present during that time on the night of the fire certainly flows logically from the arrangements of his working hours as fixed by Brenneman.[18]

■ The finding of negligence upon the part of Brenneman in providing less than an all night watchman, justified as it is, requires an affirmance of the District Court's conclusion that Brenneman is not entitled to exoneration.

Brenneman through its corporate mechanism specifically fixed the deficient part time, instead of full time, night duty on board its vessel, the "Hercules" and thus it had knowledge of the negligence that resulted in the loss. Such privity renders it ineligible to avail itself of the benefits of the Limitation of Shipowners' Act, 46 U.S.C.A. § 181 et seq., as properly found by the District Court.

■ Brenneman advanced a plethora of other propositions intended to demonstrate error by the District Court. Among them were the following:

(1) That the claimants were not entitled to the benefit of warranty of seaworthiness of the "Hercules". It is true that the District Court considered, in con-

---

16. In this connection the Trial Court properly found:

"Findings of Fact
* * *
"17. Examination of the "Hercules" subsequent to the fire disclosed extensive charring and burning on the inside of the housing, as compared with the outside, indicating that the fire had burned from the inside of the housing to the outside."

---

17. The original memorandum designating Dashields's hours of work approved over the signatures of Robert V. Hudson, Vice President of Brenneman and Earl W. Dashields, in evidence, reads:

"Hours of work:

| | | |
|---|---|---|
| 4:30 PM—Report | } | 1½ hours work |
| 6:00 PM | | |
| 6:00 PM—Supper | | |
| 7:00 PM | } | 3½ hours work |
| 10:30 PM | | |
| 10:30 PM | | Off duty-time belongs |
| 4:30 AM | | to employee |
| 4:30 AM | } | 3 hours work |
| 7:30 AM | | |
| 7:30 AM—Knock Off | | |

Rate of pay: $1.10 per hour        8 hours work per day and Sunday"

---

18. The watchman's working hours, as fixed by Brenneman's directive, were described by the Trial Judge in his findings of fact (No. 9) as a "special unpublicized arrangement". His characterization appears apt, since, again as pointed out by the Trial Judge, Brenneman's foreman, Dory R. Davenport, testified of Dashields's services, that it was his responsibility to remain aboard the "Hercules" "all night to prevent fires." On the other hand, General Superintendent Raymond R. Curnew stated at the trial that Dashields and other watchmen often stayed on the vessel all night, but that he could not state this definitively and that he knew the hours between 10:30 P.M. and 4:30 A.M. were not included in the daily eight hours for which Dashields was paid.

nection with its conclusions on both exoneration and limitation, that the failure to provide an all night watchman on the "Hercules" breached a warranty of seaworthiness to the claimants.[19] Assuming the soundness of Brenneman's objection it is to be noted that the District Court also found that Brenneman was not entitled to exoneration and limitation on the grounds of general negligence and its privity thereto, which we have approved herein. Therefore any error upon the part of the District Court with regard to the warranty of seaworthiness does not deprive its judgment against Brenneman of validity.

(2) That the District Court erred in its finding of fact No. 20, as follows:

"20. At all times material hereto, the 'Hercules', and its gear and appurtenances, were in the exclusive control of petitioner. Accordingly, it is inferred that the fire started by reason of petitioner's negligence."

In extension of this contention Brenneman urges that the doctrine of res ipsa loquitur does not apply in the instant case (although, at the same time, stating that the District Court did not apply it). This argument becomes academic in the light of the specific ruling by the District Court that the failure to maintain an all-night watchman on the "Hercules" constituted the negligence which proximately caused the claimants' damages.

(3) That its agreement with Coke Company of February 14, 1956, was not a personal contract upon any provision of which limitation could be denied.

The District Court made findings of fact and a conclusion of law concerning that contract as follows:

"FINDINGS OF FACT

\*     \*     \*     \*     \*

"23. The contract of February 14, 1956, under which petitioner was doing the repair work provided inter alia:

" 'The Contractor agrees to rebuild, restore and repair or indemnify and hold the company harmless against liability for any and all damages and injuries and damages to the property of the Company, arising directly or indirectly from, or in any way referable to or occurring in connection with the work done hereunder, whether caused by the negligence of the Contractor, its agents, or employees or otherwise.' "

\*     \*     \*     \*     \*     \*

"25. The damage to the property of Philadelphia Coke Company arose out of and was referable to the pier repair work which petitioner was doing pursuant to the contract of February 14, 1956."

"CONCLUSIONS OF LAW

\*     \*     \*     \*     \*     \*

"4. The contract of February 14, 1956, under which the repair work was being performed was the personal contract of J. E. Brenneman Company."

It is not clear whether the District Court designed these findings and conclusion of law to preclude the limitation of liability sought by Brenneman. Whatever was the intended effect it is clear that the findings and conclusions as to negligence and privity therewith, which have been affirmed, independently bar the limitation sought under Brenneman's petition.

Consideration has been given to the many other issues raised by Brenneman but none is found persuasive that the decree of the District Court should be vacated and judgment entered for Brenneman or that it be awarded any of the alternative forms of relief it sought. On

19. Conclusions of law Nos. 6 and 7 are:
"6. Petitioner is not entitled to exoneration from liability against any of the claimants because of its privity in the negligence and *the unseaworthiness of the 'Hercules'* in that there was no watchman aboard the vessel.

"7. Petitioner is not entitled to limitation of liability against any of the claimants because of its privity in the negligent act and the *unseaworthy condition* existing by reason of the failure to have a watchman aboard the 'Hercules'." (Emphasis supplied.)

the contrary the judgment of the District Court will be affirmed.

## APPENDIX

C–A Patterson

## LOAN RECEIPT

Dated September 12, 1956

Received from the Fire Association of Philadelphia (hereinafter referred to as "Company") the sum of Ten Hundred Seventy and 00/100 Dollars ($1,070.00), as a loan, without interest, repayable only in the event and to the extent of any net recovery the undersigned may make from any person, persons, corporation or corporations, or other parties, causing or liable for the loss or damage to the property described below, or from any insurance effected on such property, and as security for such repayment the undersigned hereby pledges to the said "Company" all his, its or their claim or claims against said person, persons, corporation or corporations or other parties, or from any insurance carrier or carriers, and any recovery thereon, and hereby delivers to said "Company" all documents necessary to show his, its or their interest in said property.

The undersigned covenants that no settlement has been made by the undersigned with any person, persons, corporation or corporations, or other parties against whom a claim may lie, and no release has been given to anyone responsible for such loss and that no such settlement will be made, nor release given without the written consent of the said company; and the undersigned covenants and agrees to cooperate fully with the said company, to promptly present claim and, if necessary, to commence, enter into and prosecute suit against such person or persons, corporation or corporations, or other parties, through whose negligence or other fault the aforesaid loss was caused, or who may otherwise be responsible therefor, with all due diligence, in his, its or their own name.

In further consideration of said advance the undersigned hereby guarantee(s) that he, it or they are the owner(s) of said property and entitled to recover upon said claim for loss or damage thereto, and hereby appoint(s) the managers and/or agents of the said "Company" and their successors severally, his, its or their agent(s) and attorney(s)-in-fact, with irrevocable power, to collect any such claim or claims, and to begin, prosecute, compromise or withdraw in his, its or their name, but at the expense of the said "Company," any and all legal proceedings that the said "Company" may deem necessary to enforce such claim or claims, and to execute in the name of the undersigned, any documents that may be necessary to carry the same into effect for the purposes of this agreement.

Any legal proceedings are to be under the exclusive direction and control of said "Company."

The property hereinabove set forth is as follows:

IN WITNESS WHEREOF         has affixed         hand and seal (or the Patterson Oil Company has caused this instrument to be signed by its duly authorized officer and the seal of the corporation affixed thereto) this 21st day of September, 1956.

Witness:

FLORENCE S. LINDEMEN

EDW. A. GALLAGHER, JR.
Treasurer

## FOR INDIVIDUALS

STATE OF PENNSYLVANIA
COUNTY OF PHILADELPHIA } ss.

On the         day of 19    before me came         to me known to be the individual described in, and who executed, the foregoing instrument, and acknowledged that         executed the same.

Notary

## FOR CORPORATIONS

STATE OF PENNSYLVANIA
COUNTY OF PHILADELPHIA } ss.

On the 21st day of September 1956 before me came Edw. A. Gallagher, Jr., to

be known, who, being by me duly sworn, did depose and say that he resides in Phila., that he is the Treasurer of Patterson Oil Company the corporation described in, and which executed the foregoing instrument, that he knows the seal of said corporation, that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; and that he signed his name thereto by like order.

CHRISTINE A. HOEFER
Notary Public,
Philadelphia, Philadelphia Co.

My Commission Expires June 8, 1959

McLaughlin and Ganey, Circuit Judges, dissented.