**Eutimio PUAMIER, Plaintiff,**

**v.**

**BARGE BT 1793, etc., et al., Defendants.**

**Ruth A. MOREWITZ, Administratrix of the Estate of Barry Belshaw, Deceased, Plaintiff,**

**v.**

**BARGE BT 1793, etc., et al., Defendants.**

**Ruth A. MOREWITZ, Administratrix of the Estate of Juan Rodriguez, Deceased, Plaintiff,**

**v.**

**BARGE BT 1793, etc., et al., Defendants.**

**Civ. A. Nos. 12–73–N, 14–73–N and 13–73–N.**

United States District Court, E. D. Virginia, Norfolk Division.

Nov. 20, 1974.

1022

Burt M. Morewitz, Newport News, Va., for plaintiffs.

Furr, Jett, Sykes, Berkley & Heilig, Norfolk, Va., for defendant Gulf Maritime Corp. and for claimants Ocean Marine Services, Inc., Diane Corp. and Mike Zapetis.

Crenshaw, Ware & Johnson, Norfolk, Va., for intervening plaintiff Peoples First National Bank of Miami Shores.

Seawell, McCoy, Winston & Dalton, Norfolk, Va., for Oceanic Transport Co.

Richard I. Gulick, Norfolk, Va., for Frank Brawley, etc.

## OPINION AND ORDER

KELLAM, Chief Judge.

This case involves the sinking of the Tug MICHELE as it was proceeding northward from Miami, Florida, to Richmond, Virginia. At the time it was towing Barge BT 1793, which did not sink but was salvaged undamaged. Wound up in this case are the problems of which of two corporations actually owned the MICHELE, was there any unseaworthiness or negligence involved to allow the injured crewmen and the estates of the deceased crewmen to recover from the responsible parties, and who is liable for the expenses incurred in the eventual salvage operation. The facts are lengthy, but must be set out in order to properly explain the Court's ruling.

The Tug MICHELE and Barge BT 1793 were, as of early November in 1972, owned by Oceanic Transport Company (OTC). Henry Larson was President and Max Larson, Henry's son, was Vice-President of the Company. The MICHELE and Barge BT 1793 were its only assets. Ocean Service Corporation, of which Michael Zapetis was President and sole stockholder, wanted to purchase

the MICHELE and the Barge in order to fulfill a Navy contract that required the hauling of sand from Richmond, Virginia, to Cuba. As the facts show, Ocean Service Corporation (OSC) had previously owned the MICHELE and had operated her in the Gulf of Mexico for years, using her for hauling barges between Georgia and Puerto Rico, Miami and Puerto Rico, and Georgia and South America. Another company in which Zapetis held shares of stock had at one time owned the Barge in question. Both the MICHELE and the Barge were sold to OTC in 1970, and now OSC wished to buy them back.

OTC wanted a buyer who was more financially secure than OSC, so OSC arranged to have Gulf Maritime Corporation (GMC), William Gruman, President, buy the Tug and Barge. GMC would then lease the Tug and Barge to OSC so the Navy contract could be completed. Zapetis and Gruman negotiated the sales agreement with Max Larson, and a contract of sale was signed late in the afternoon on Friday, November 3, 1973, by Max Larson and William Gruman as officers of their respective companies.

By the terms of the agreement, GMC agreed to pay a combined purchase price of $125,000.00 for the MICHELE and the Barge. $20,000.00 was paid in cash at the time of the signing. As to the remaining $105,000.00, GMC agreed to assume an existing preferred ship's mortgage for which Max and Henry Larson had made themselves personally liable. The assumed mortgage amounted to $38,000.00 on the MICHELE, and $34,495.02 on the Barge. GMC also agreed to secure a second ship's mortgage, under certain conditions which are not material here, in the amount of $32,504.98. Aside from the purchase price, GMC agreed to take out hull and P & I insurance, and to make OTC and the mortgagee bank the named beneficiaries.

At this juncture it is necessary to discuss the leasing agreement between GMC and OSC, and its relationship to the contract of sale between GMC and OTC. The leasing agreement was oral, and called for OSC to be a bareboat charterer of the MICHELE and the Barge. It would be the responsibility of OSC to hire a master and crew for the MICHELE and the Barge, and OSC agreed to supply sufficient insurance to satisfy the terms of the contract of sale. Thus, GMC would not actually have to contract for the necessary insurance. It is unclear whether a survey was ordered by GMC or OSC, but it is uncontroverted that a survey was performed so that insurance could be obtained by OSC. The survey, performed on November 3, 4 and 5, 1972, found the condition of the MICHELE to be "good," that the hull and deck were well caulked and apparently free from leaks, and that she was in general "heavily built." In conclusion the survey noted "No defects were apparent which would affect or impair the structural strength of the vessel." The survey reached the same conclusion regarding the Barge.

Although the sequence of events is somewhat unclear, at some time on Saturday, November 4, insurance binders were issued on OSC's behalf naming GMC, OTC, and the mortgagee bank as beneficiaries. These binders were accepted by OTC as fulfilling the insurance terms of the contract of sale. On the same day Zapetis took possession of the Tug and Barge directly from OTC, doing so with the proper authorization from GMC to accept delivery.

Zapetis, acting as President of OSC, hired Williams as the master of the MICHELE. Williams hired his cousin, Owens, as cook and mate. Zapetis also hired Belshaw as the engineer, and Puamier, Rodriguez and Zavala as the deckhands.

The MICHELE, towing Barge BT 1793 with a length of 6″ diameter polyethylene line, that was approximately 300 feet to 500 feet out (the total length of the tow line was estimated at 600′ to 1000′), left Miami, Florida, on Sunday,

November 5, at approximately 7:00 p. m. Prior to her sailing, Zapetis personally boarded the MICHELE and looked her over. On board when the MICHELE left Miami was Williams and the crew of five. At the time of sailing the weather was clear, and no evidence exists to show that bad or rough weather was or should have been expected. The Tug was equipped with a new VHF radio, a Loran radio telephone, and a National receiver with a radio bank on it. All three were capable of receiving weather reports.

By the morning of Monday, November 6, there was about one foot of water in the bilge, although there is no explanation as to how it got there. Due to the fact that the permanent pump was out of order, a smaller, portable pump was used to remove the water, this being effected between the hours of 8 a. m. and noon. By noon the water was completely gone and no problem seems to have existed in the way of a permanent, constant leak.

It seems that in the morning the sea was not very rough at all, but that after noon the sea became progressively worse. At this point the facts become quite sparce because the three crewmen who survived the eventual sinking were in their quarters during the time that the MICHELE began foundering, and two of the three were actually asleep until after it became apparent that the MICHELE was in serious danger. The two people who would know the most about the operation of the Tug, the master, Williams, and the engineer, Belshaw, drowned while waiting for rescue from the Coast Guard.

What is certain is that a port list developed sometime during the afternoon. Zapetis stated that at 2:00 p. m. Williams was in touch with another boatman by radio and asked that a message be relayed to Zapetis that everything was fine. However, when crewman Zavala woke up between 3:00 p. m. and 4:00 p. m. the sea was very rough and

trouble had developed. By the time Zavala awoke, Rodriguez was already on deck trying to secure a dozen or so five gallon cans of oil that were rolling about freely. Shortly after 5:00 p. m. Williams transmitted an S-O-S. Within minutes the MICHELE rolled to port and sank. Her location was four to five miles off of the East Coast of Florida, and she sank in 66 feet of water. There is no evidence of the strength of the wind, but the swells were from seven to ten feet. All six hands got free of the sinking Tug, but Williams, Belshaw and Rodriguez drowned while awaiting rescue. Zavala and Owens survived by clinging to debris from the MICHELE, and Puamier swam to the Barge and climbed on board to await rescue. On the morning of November 7, the Coast Guard picked up the survivors as well as the bodies of the deceased crewmen. All hands were accounted for.

On November 7, 1972, James Brawley, a marine salvor, learned of the sinking and called the Coast Guard. Brawley cannot be sure if the Coast Guard told him whether OTC or OSC was the proper owner, but he is sure that the telephone number given to him resulted in his being put in touch with Zapetis. Brawley and Zapetis reached an oral agreement regarding the salvage of the Barge, which was still afloat and connected to the Tug by the tow line. Brawley salvaged the Barge and brought it back to Miami. In the meantime, Zapetis confirmed their oral agreement by a telegram sent to Brawley. The telegram was signed "Ocean Service Corp Michael Zapetis President." In a subsequent telephone conversation Zapetis and Brawley confirmed an agreement to attempt to salvage the MICHELE, which was reduced to writing in the form of another telegram signed "Ocean Service Corp." Both Zapetis and Brawley are in agreement that Zapetis orally told Brawley that the Barge would stand as security for the expenses generated in salvaging the MICHELE. This was never put in writing, however.

**1028**

To conclude this lengthy explanation of the facts, the Barge was taken to Virginia where it was sold to satisfy other creditors. It is now out of the picture. Brawley expended great sums attempting to raise the MICHELE but was unsuccessful. His total bill of $53,101.81 is still outstanding. Because the contract of sale was signed, and the delivery of the Tug and Barge occurred over the week-end, no official bill of sale was ever transferred (although one was executed by the seller), nor were the vessels ever re-registered with the Coast Guard to denote a transfer in title. Finally, the insurance binders were, for reasons not material here, invalid and there was no insurance to cover the loss.

Thus, there are three general issues in the case at bar, and each one will require a resolution of many sub-issues:

I. Which corporation, Oceanic Transport Co. or Gulf Maritime Corp., actually owned the Tug and the Barge when the MICHELE sank?

II. What recovery, if any, will be allowed to the injured crewmen and the estates of the deceased crewmen for the alleged unseaworthiness and negligence involved?

III. Who, if anybody, is responsible to Brawley for his salvage claim of $53,101.81?

I

■ Before we can discuss which corporation owned the MICHELE when she sank, we must determine what law should be applied. Counsel for all the parties concerned seem to have taken it for granted that the question of title is to be resolved by applying general maritime law. We are of the opinion, however, that the question of title is one of state law, in specific the law of the State of Florida, since both parties were incorporated in Florida, the contract was signed in Florida, and the vessel

was located in and delivery was effected in Florida.[1]

■ In determining the proper owner of the vessel, the admiralty law does not have any form of action akin to the common law action to quiet title to land. Only in certain limited circumstances can the ownership of a vessel be litigated in admiralty. For instance, a "petitory suit" requires that a plaintiff already hold legal title, and the suit can only determine the plaintiff's right to possess a vessel still in the hands of the defendant. *Stathos* v. *The Maro,* 134 F.Supp. 330, 1956 A.M.C. 188 (E.D.Va. 1955); *Circle Fisheries Co., Inc.* v. *Seabrooke,* 103 F.Supp. 734 (W.D.Pa.1952). Generally speaking, however, a contract for the sale of a ship is not a maritime contract and is not cognizable in admiralty. *Flota Maritima Browning de Cuba, S. A.* v. *Snobl,* 363 F.2d 733, 735 (4th Cir. 1966); *Noel* v. *United Aircraft Corp.,* 204 F.Supp. 929, 934 (D. Del.1962). Similarly, a suit seeking specific performance of a contract for the sale of a ship is not cognizable in admiralty. *See Hirsch* v. *The San Pablo,* 81 F.Supp. 292 (S.D.Fla.1948). We feel that in the case at bar the resolution of the question of ownership will necessarily turn on the contract of sale, and, as in the cases cited above, the issue is one in which the general maritime law is not controlling.[2]

■ For over a century the Supreme Court has held that the question of the validity of the sale of a vessel is to be resolved by reference to the appropriate state law, not the general maritime law. *Stewart & Co.* v. *Rivara,* 274 U.S. 614, 47 S.Ct. 718, 71 L.Ed. 1234 (1927); *Bulkley* v. *Honold,* 60 U.S. (19 How.) 390, 15 L.Ed. 663 (1856); *Sturgis* v. *Honold,* 60 U.S. (19 How.) 393, 15 L.Ed. 666 (1856). As was previously noted, both corporations were incorporated in Florida, the contract was signed in Flor-

1. The result would be the same under either Florida law or the general maritime law, but this will be discussed more fully later on.

2. A court of admiralty would not normally have jurisdiction over a claim such as this, but since it is only brought as a cross-claim, F.R.Civ.P. 13(g) applies.

ida, the MICHELE was located in Florida, and delivery was effected in Florida. That Florida law is to be applied seems clear.

■ Within the last decade a number of courts have determined that ships are "goods" within the meaning of the Uniform Commercial Code. *Fireman's Fund American Insurance Co. v. Boston Harbor Marina, Inc.,* 406 F.2d 917, 919 (1st Cir. 1969); *R. C. Craig, Ltd. v. Ships of Sea, Inc.,* 345 F.Supp. 1066 (S. D.Ga.1972); *Silver v. Sloop Silver Cloud,* 259 F.Supp. 187 (S.D.N.Y.1966). *See U.C.C.* § 2–105(1); *Fla.Stat.* § 672.-2–105(1).

*Fla.Stat.* § 672.2–401 governs the passing of title on "goods" sold in Florida. Subsection one (1) notes that, subject to any reservation of a security interest which would be governed by Article 9, "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." Subsection two (2) states that:

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest in a bill of lading.

(a) * * *

(b) * * *

Subsection three (3) states that:

(3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods: (a) if the seller is to deliver a document of title, title passes at the time when and the place when he delivers such documents; or

(b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

■ Subsection two does not apply to our consideration of when title passed because it only governs instances where the seller is to deliver the goods contracted for. Since the MICHELE and the Barge BT 1793 were to be delivered where they were moored—at Jones' Boatyard—only subsection three is really applicable.

■ Paragraph five of the contract of sale, which recites an agreement by both parties to execute "any other documents needed to close this transaction," should not be read to require that a document of title must be transferred in order to pass title. If this requirement were to be read into the contract, then *Fla.Stat.* § 672.2–401(3)(a) might apply. However, we feel that paragraph five is merely a general recitation that whatever signatures or documents were needed to complete the transaction—such as mortgage documents, bills of lading, and registry documents—would be ultimately furnished. We are left with *Fla.Stat.* § 672.2–401(3)(b).

■ It is well accepted that the parties may place limitations on the passage of title that would nevertheless be valid even though not specifically contemplated by the U.S.C. *See Silver v. Sloop Silver Cloud, supra.* Each subsection in *Fla.Stat.* § 672.2–401 is prefaced with the language "Unless otherwise agreed . . . ." In the case at bar we find nothing in the contract of sale meant to be a condition precedent to the passage of title. Granted, OTC and GMC did agree to many things, but we do not believe that the failure to perform any of these was intended to prohibit the passage of title. For example, the parties agreed not to sail the Tug and Barge to any port that was not American. It cannot be imagined that if the MICHELE had later sailed to a foreign port OTC would sue alleging that this somehow divested GMC of title. Accordingly, *Fla.Stat.* § 672.2–401(3)(b) states that title would pass when the contract was made.

**1030**

The situation is somewhat confused by the fact that OTC and GMC seemed to treat the obtaining of insurance binders as a prerequisite to the relinquishment of the MICHELE and the Barge even though not required by the contract. Even assuming that the parties did agree to wait until insurance binders were obtained and the mortgages were assumed before title could pass to GMC, on the facts before us all of these acts occurred sometime prior to delivery on November 5, 1972. Thus, when the MICHELE and Barge BT 1793 left Miami on that day she belonged to GMC. *See generally Anderson, Uniform Commercial Code* §§ 2–401:25, 2–401:30, and 2–401:40 (2nd ed. 1971).

It might be argued that if we had applied general maritime law a different result would have been reached. Yet on the basis of the arguments made and the authority cited, we reach the same conclusion that GMC was indeed the owner.

It is asserted that because no bill of sale was ever transferred and the MICHELLE was never re-registered, OTC must be the owner. OTC has stipulated that it is the record owner, but that does not bear on who the actual owner is. The Supreme Court and various lower courts have held repeatedly that the true ownership of a vessel is not dependent upon its registry. *Stewart & Co.* v. *Rivara*, 274 U.S. 614, 618, 47 S.Ct. 718, 71 L.Ed. 1234 (1927); *Hozey* v. *Buchanan*, 41 U.S. (16 Pet.) 215, 10 L.Ed. 941 (1842); *Southern Bell T. & T. Co.*, 62 F.2d 1015, 1933 A. M.C. 284 (5th Cir. 1933); *Kitty C.*, 1937 A.M.C. 1327, 1329 (S.D.Fla.1937). On facts far different from those in the case at bar, the Fourth Circuit has chosen to ignore a ship's registry in order to find out who actually owned a particular vessel. *Meacham Corp.* v. *United States*, 207 F.2d 535 (4th Cir. 1953), *cert. dism'd.*, 348 U.S. 801, 75 S.Ct. 17,

99 L.Ed. 633 (1954). To hold that failure to re-register the MICHELE, as required by 46 U.S.C. § 29 *et seq.*, binds OTC as the actual owner is to misread the purpose of the registry provisions.

The purpose of the registry statutes is to afford to properly registered American vessels certain benefits provided by the laws of the United States. *Stewart & Co.* v. *Rivara, supra; The Neptune*, 16 U.S. (3 Wheat.) 601, 4 L.Ed. 469 (1818); *Willing* v. *United States*, 4 U.S. (4 Dall.) 373, 1 L.Ed. 872 (1804), aff'd. 8 U.S. (4 Cranch) 48, 2 L.Ed. 546 (1807). In return, American vessels are required to obey the laws of the United States. *Hall* v. *DeCuir*, 95 U.S. 485, 24 L.Ed. 547 (1877). An American vessel that is not properly registered may not avail itself of certain privileges afforded to vessels properly flying the American flag, but there is no effect worked upon the ownership of a vessel merely because it has not been properly registered. The registry statutes were intended to encourage and stimulate the American shipping industry, *Old Dominion S. S. Co. of Virginia*, 198 U.S. 299, 25 S.Ct. 686, 49 L.Ed. 1059 (1905), not to create a national title statute. *Cf. Stewart & Co.* v. *Rivara, supra*, 274 U.S. at 618, 47 S.Ct. 718. *See generally* 70 *Am.Jur.2d*, Shipping §§ 39, 94 (1966); 48 *Am.Jur.*, Shipping § 64 (1943); 12 *United States Supreme Court Digest*, Shipping §§ 9(i), (r) (1967). The failure to re-register the MICHELE with the Coast Guard does not affect our previous ruling that GMC was the actual owner of the MICHELE and Barge BT 1793 when they left Miami on November 5, 1972.[3]

The last question to be resolved in the general issue of ownership is whether GMC owes the remainder of the purchase price, $105,000.00, to OTC. The argument forwarded by GMC is that since a survey was performed and

---

3. As will be pointed out later, the question of ownership may be irrelevant regarding liability if unseaworthiness or negligence is found because of OSC's position as a demise

(bareboat) charterer. *Vitozi* v. *Balboa Shipping Co.*, 163 F.2d 286, 289 (1st Cir. 1947).

nothing was found wrong with the MICHELE, then anything that eventually did go wrong had to be an inherent flaw for which OTC would be liable on its implied warranty of seaworthiness. OTC counters that the survey relieved it of responsibility for certain defects in the MICHELE. *Wilken v. Holland,* 1965 A.M.C. 642 (4th Cir. 1964). We do not need to consider the question of whether a valid warranty is involved because we do not feel that the MICHELE sank through any inherent unseaworthiness. Thus, the question of the operation of a warranty is irrelevant. GMC does owe the balance of the purchase price to OTC, that amount being $105,000.00.

## II

The second major issue facing the Court is the right of the injured crewman Puamier and of the estates of crewman Rodriguez and engineer Belshaw to recover against the responsible parties. Involved within this issue are claims for unpaid wages, claims for funeral expenses, a claim for maintenance and cure, and general claims of unseaworthiness and negligence.

Aside from maintenence and cure, which will be discussed later, an injured seaman may recover for personal injuries by proving negligence or unseaworthiness. Unseaworthiness and negligence were historically two completely different remedies. *See The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). Within the past thirty years, however, the distinction has become so vague as to lead one commentator to note that the distinction has been erased. Norris, *Maritime Personal Injuries* § 22 at 41 (2d ed. 1966), commenting on *Mahnich v. Southern S. S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

As to the general warranty of seaworthiness, a shipowner owes to his crew the duty to provide a sound vessel and proper equipment, and to keep such in a state of proper repair. *The Osceola, supra; Dixon v. The Cyrus,* Fed.Cas.No.3,930 (D.Pa.1789). The shipowner's liability is not based on any theory of negligence or foreseeability, but is an absolute duty, irrespective of the actual control or the amount of diligence exercised by the shipowner or his agents. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed. 2d 941 (1960); *Seas Shipping Co., Inc. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, *reh. denied,* 328 U.S. 878, 66 S.Ct. 1116, 90 L.Ed. 1646 (1946); *Mahnich, supra; Ballwanz v. Isthmian Lines, Inc.,* 319 F.2d 457 (4th Cir. 1963); *Ondato v. Standard Oil Co.,* 210 F.2d 223 (2d Cir. 1954). The law does not require that the vessel and her equipment be perfect. What is required is that the vessel and her equipment must be reasonably suitable for their intended purpose. *Mitchell v. Trawler Racer, Inc., supra,* 362 U.S. at 550, 80 S.Ct. 926; *Lundy v. Isthmian Lines, Inc.,* 423 F.2d 913, 915 (1970); *Bryant v. Partenreederei-Ernst Russ,* 330 F.2d 185, 188 (4th Cir. 1964); *Fox v. S. S. MOREMACWIND,* 182 F.Supp. 7, 11 (E.D.Va.1960), aff'd. 285 F.2d 222 (4th Cir. 1960).

Once a seaman has sustained an injury, in order to recover under the theory that the vessel was unseaworthy, the seaman need only show that some defect in the vessel or her apparatus existed and that the defect was the proximate cause of the injury.[4]

An action for negligence under the Jones Act, 46 U.S.C. § 688, is somewhat similar to a common law action for negligence, although recovery is

---

4. Technically, it must be shown that the injured person was a crew member, that the vessel was in navigable waters, that the injury was connected to the operation of the vessel, that there was a defect or deficiency, and that it was the proximate cause of the injury. Norris, Maritime Personal Injury § 54 at 121 (2d ed. 1966). Only the last two are at issue in the case at bar.

more liberally allowed. *See* Edelman, *Maritime Injuries and Death* (1960), commenting on *Koehler* v. *Presque-Isle Transp. Co.,* 141 F.2d 490 (2d Cir.), *cert. denied,* 322 U.S. 764, 64 S.Ct. 1288, 88 L.Ed. 1591 (1944). *See also Deen* v. *Hickman,* 358 U.S. 57, 79 S.Ct. 1, 3 L. Ed.2d 28 (1948). The Act made available to seamen the same right of recovery from their employers that the railroad workers were given under FELA, 45 U. S.C. § 51 *et seq.* Under the Act, a seaman may recover for injuries inflicted by equipment which is defective due to negligence, or by the negligent actions of fellow crewmen or officers, or other agents of the employer. *See* 46 U.S.C. § 688. *See also Gillespie* v. *United States,* 379 U.S. 148, 85 S.Ct. 308, 13 L. Ed.2d 199 (1964); *Lindgren* v. *United States,* 281 U.S. 38, 50 S.Ct. 207, 74 L. Ed. 686 (1930); *West* v. *Marine Resources Comm'n.,* 330 F.Supp. 966, 968 (E.D.Va.1970). Again, the equipment needn't be perfect or "the best," but it must be reasonably fit for its intended use. *Jacob* v. *The City of New York,* 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166 (1942).

■ At one time, Jones Act negligence and unseaworthiness were thought to be separate and distinct causes of action. Negligence was sometimes referred to as "operational negligence," as it was thought that negligence really applied to the manner in which the vessel was operated. Unseaworthiness was thought to apply to the equipment and the structural features of the vessel. As previously noted, however, the distinction between the two has all but disappeared. *Mahnich* v. *Southern S. S. Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). Unseaworthiness may result from the negligent operation of a vessel,

and it is quite clear that the two may be pleaded together as no election is required. *McAllister* v. *Magnolia Petroleum Co.,* 357 U.S. 221, 225, 78 S.Ct. 1201, 2 L.Ed.2d 1272 (1958). *See* Norris, *The Law of Seamen,* § 678 p. 336 n. 19 (3d ed. 1970). The evidence is submitted to the trier of fact for a determination on either theory of recovery.

■ In the case at bar, there are three methods by which the personal representatives of the deceased plaintiffs may recover; the Jones Act, the Death on the High Seas Act (46 U.S.C. § 761), and the general maritime action for wrongful death as enunciated in *Moragne* v. *States Marine Lines,* 398 U. S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

The Jones Act recovery for death is again predicated upon negligence. The Death on the High Seas Act (DOHSA) allows recovery for either negligence or unseaworthiness, and the general maritime action for wrongful death is a relatively new, judicially created remedy that fills in some of the gaps between the Jones Act and DOHSA.[5] Although each remedy has some differences, they are not material here because this case fits into the overlapping areas of coverage.[6] Those few distinctions that are relevant will be noted later. Again, no election is required and all theories of recovery may be pleaded in the same cause of action. *Doyle* v. *Albatross Tanker Corp.,* 367 F.2d 465 (2d Cir. 1965); *Symonette Shipyards Ltd.* v. *Clark,* 365 F.2d 464 (5th Cir. 1966).

In support of the claims of negligence and unseaworthiness plaintiffs' counsel has advanced many things that he alleges were wrong with the equipment of the MICHELE: the life jacket straps

---

5. Read Norris, The Law of Seamen, § 654 (3d Ed. 1970) in conjunction with Moragne v. States Marine Lines, supra. See also, Norris, Maritime Personal Injuries, the chapter on "Maritime Wrongful Death."

6. See footnote 4. As an example, the Jones Act covers only deaths of crewmen, while

DOHSA covers deaths to any individual. However, the Jones Act applies to all navigable water while DOHSA only applies to deaths at sea. Since this case involved the death of a crewman at sea, both acts apply.

were dry rotted, the auxiliary pump was of insufficient capacity, the hull leaked, etc. The Court does not find any of this persuasive. We do not believe that some of these assertions are factually correct, but even assuming that they are we do not believe that the plaintiffs have carried their burden by showing that any of the above was the proximate cause of the deaths or injuries. *Gardner v. National Bulk Carriers, Inc.,* 310 F.2d 284, 287 (4th Cir. 1962), *cert. denied,* 372 U.S. 913, 83 S.Ct. 728, 9 L.Ed. 2d 721 (1963). In examining all of the testimony before the Court, however, we find that the plaintiff has proven that it was negligent for the MICHELE to be towing Barge BT 1793 in the manner in which it was being towed, and that this negligence resulted in making the MICHELE unseaworthy.

Unseaworthiness is a relative concept. Although a vessel may be fit for one purpose of assignment, it may be wholly unfit for another. *Lester v. United States,* 234 F.2d 625 (2d Cir. 1956); *Newport News Shipbuilding & Dry Dock Co. v. Watson,* 19 F.2d 832 (4th Cir. 1927); *Hanrahan v. Pacific Transport Co.,* 262 F. 951 (2d Cir. 1919), *cert. denied,* 252 U.S. 579, 40 S. Ct. 345, 64 L.Ed. 726 (1920); *Continental Oil Co. v. Lindley,* 382 S.W.2d 296, 1965 A.M.C. 989 (Tex.Civ.App.1964). Even though there is some testimony that the MICHELE had previously seen service in the Gulf of Mexico and had not had any trouble, this cannot be dispositive in regard to the particular incident under consideration.

The MICHELE was built in 1944. She was 68.9 feet long, 20.1 feet in breadth, was 8.4 feet deep, and had approximately two feet of freeboard. Her

weight was 95.79 gross tons. She was powered by two diesel engines that developed a total of 900 horsepower at 2100 R.P.M. Barge BT 1793 had a length of 203.5 feet, was 40.1 in breadth, and 15.2 feet deep. It had three feet of freeboard when loaded, but was unloaded when the sinking occurred. There is no evidence of how much freeboard the Barge had in that state, but it was probably a considerable amount. The Barge weighed 1081.65 gross tons.

It is the opinion of the Court that the MICHELE was not powerful enough to overcome the drag caused by the Barge in the high winds and rough seas. Further, the difficulty was multiplied by the fact that the tow line was too short. Considering these two things together, we find that it was negligent to send the MICHELE out on such an assignment. This negligence rendered the MICHELE unseaworthy.

Every witness who was asked why the MICHELE sank gave testimony that is supportive of the conclusion we have reached.[7] Eutimio Puamier stated that the Barge and Tug were out of sync, and indicated that the Tug and Barge were not rising and falling together. Mauro Zavala testified that the Barge caused such a drag on the stern of the Tug that the Tug was unable to rise with the waves. Instead the stern was held down. In his opinion, the Tug would not have had such problems had the tow line been longer. Mary Belshaw, the widow of the deceased engineer Barry Belshaw, testified that her husband had told her that the Tug had almost sunk on another occasion because the Barge pulled the stern of the Tug down.[8] Brawley, the salvor,

7. Admittedly, no witness ever qualified as an expert, but some of the witnesses did have considerable experience in the field of tugboats and towing. Further, non-expert testimony can be the basis for a finding of unseaworthiness. *See* Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119, 8 L. Ed.2d 313, *rehearing denied,* 370 U.S. 965, 82 S.Ct. 1578, 8 L.Ed.2d 834 (1962); Jones v. Den Norske Amerikalinje A/S, 451 F.2d 985 (3d Cir. 1971).

8. This incident occurred after OSC sold the Tug to OTC in 1970, but before GMC pur-

who was experienced with tugboats, stated that in his opinion the Barge was probably being blown in a westerly direction, and the Tug was probably flipped over because of the pull of the Barge. Even Michael Zapetis, the charterer of the Tug and an individual with over twenty years' experience in marine work, testifying prior to learning that he had been named as a party defendant, stated that in his opinion the Tug sank from the Barge pulling it over.

■ That the Barge caused the sinking of the MICHELE is an inescapable conclusion. We cannot say whether the sinking occurred solely because the MICHELE was not powerful enough or big enough, or because the tow line was too short for a tow in rough seas. We conclude, rather, that all of these contributed to a substantial degree, and it is not necessary for the plaintiff to prove which cause contributed to the greatest degree or that one was indeed the sole cause. *cf. Johnson v. Griffiths S. S. Co.,* 150 F.2d 224, 226 (9th Cir. 1945).

■ The defendants argue that when the MICHELE left Miami on Sunday the weather was clear and no rough weather was expected; since the weather that the MICHELE ran into was unexpected, the sinking should not give rise to any liability. This misstates the legal principle involved, however. If it could be shown that the weather the MICHELE ran into was unusually severe, then liability might be escaped under the theory that such a calamity is a peril of the sea for which no warranty of unseaworthiness extends. Such is not the case here. The evidence establishes that the rough weather experienced by the MICHELE was entirely normal for that part of the Florida coast during the winter months. As such, the warranty

of seaworthiness extends to these weather conditions. A vessel must be fit for the normal weather conditions of the area in which she operates. Compare *Walker v. Harris,* 335 F.2d 185 (5th Cir.), *cert. denied,* 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964), and *Petition of Cherokee Trawler Corp.,* 157 F.Supp. 414 (E.D.Va.1957). As stated earlier, the warranty of seaworthiness requires that a vessel be fit for her intended use, and that use encompasses the normal weather conditions within a given area. The duty imposed is an absolute duty not based in any part on the notion of foreseeability. Liability under the theory of unseaworthiness is clear. We also hold that the problems experienced were foreseeable for the purpose of imposing liability under the theory of negligence as well. It was negligent to send out a small tug towing a large barge with a short tow rope in winter seas.

## A

■ The defendants have petitioned to limit their liability in the event that unseaworthiness was found. The Limitation of Liability Act, 46 U.S.C. §§ 183–185, was enacted to encourage American shipbuilding and commerce by confining the risk of a shipowner who was not at fault to his interest in the ship. *American Car & Foundry Co. v. Bassert,* 289 U.S. 261, 53 S.Ct. 618, 77 L.Ed. 1162 (1933); *Richardson v. Harmon,* 222 U.S. 96, 104, 32 S.Ct. 27, 56 L. Ed. 110 (1911). An owner who was not at fault may not be held liable for any more than the value of the ship and the freight then pending. The value of the ship is its value after the accident, *Norwich v. Wright,* 80 U.S. 104, 13 Wall. 104, 20 L.Ed. 585 (1871), which in the case before us is nothing. Certain provisions are made to guarantee that some money will be made available where per-

chased the Tug from OTC in 1972. Although this testimony was hearsay, it was not objected to and may therefore be considered for whatever probative value that it

has. Rowland v. St. Louis S. F. R.R. Co., 244 U.S. 106, 108, 37 S.Ct. 577, 61 L.Ed. 1022 (1917).

sonal injury or death is involved, but even that fund would be insufficient to cover the hundreds of thousands of dollars sought by the plaintiffs. *See* 46 U. S.C. § 183(b). Thus, if certain criteria are met the shipowner has the right to limit his liability to the extent provided by the Act.

In a limitation petition, the burden is on the shipowner to prove his lack of privity or knowledge of the existence of the negligent or unseaworthy condition. *Coryell* v. *Phillips,* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943); *In re Marine Sulphur Queen,* 460 F.2d 89, 101 (2d Cir. 1972); *Nuccio* v. *Royal Indemnity Co.,* 415 F.2d 288 (5th Cir. 1969); *Corrao* v. *M/V Act III,* 359 F. Supp. 1160, 1165 (S.D.Fla.1973). This means that if the shipowner knew or should have known that a certain condition existed then he may not limit his liability. *In re Marine Sulphur Queen, supra* at 101. In the case before us the shipowner has not carried that burden and is not entitled to limit its liability.

### B

Normally, GMC, whom we have already determined was the owner of the MICHELE, would be held liable for an unseaworthy condition. OSC, the employer, would be held liable for negligence under the Jones Act. However, any liability which would normally be placed on the owner, GMC, must now be placed on OSC because of the demise (bareboat) charter involved here. It is quite clear that a demise charterer stands in the shoes of the owner for the purposes of imposing liability. *See Vitozi* v. *Balboa Shipping Co.,* 163 F.2d 286, 289 (1st Cir. 1947), citing *United States* v. *Shea,* 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403 (1894); *Leary* v. *United States,* 81 U.S. (14 Wall.) 607, 610, 20 L.Ed. 756 (1871); *Reed* v. *United States,* 78 U.S. (11 Wall.) 591, 600–601, 20 L.Ed. 220 (1870). Thus, the duty normally owed by GMC was now owed by OSC. We must concern ourselves

with what OSC, through its agents, knew or should have known. Acting through Zapetis, it was OSC that furnished the tow line, and the corporation is responsible for what Zapetis knew or should have known. *Petition of Long,* 439 F.2d 109 (2d Cir. 1971); *Petition of J. E. Brenneman Co.,* 322 F.2d 846 (3d Cir. 1963). We infer that Zapetis had actual knowledge of the length of the tow line since he provided it, and if he did not have actual knowledge then he certainly should have. Zapetis also should have informed himself of the operational limitations of the MICHELE and of the fact that the normal weather conditions for that area included rough seas and high winds. To not hold OSC liable for those facts that Zapetis should have known would be to substantially undermine the policy behind allowing an *innocent* shipowner to limit his liability. In the future a shipowner or demise charterer would merely make it a point not to have actual knowledge and thereby escape liability. OSC, as the employer, is liable for the proven negligence, and as the *de jure* owner, is liable for unseaworthiness. The awards made for personal injury, death, pain and suffering, and lost future earnings are set out in the appendix and are chargeable to OSC. Other awards are set out in the appendix and are briefly discussed below.

All three are entitled to recover their unpaid wages under 46 U.S. C. §§ 594–601. Usually, when a crewman is injured during a voyage, wages are to be paid as if the crewman had worked for the entire voyage. Norris, *The Law of Seamen,* § 544 p. 15 (3d ed. 1970). However, there is no evidence that the three contracted for the entire voyage up to Virginia and back, or that any time was fixed. Consequently, we award wages only for the remainder of the pay period, the pay period being one month. *See Creppel* v. *J. W. Banta Towing, Inc.,* 202 F.Supp. 508, 513 (E.

D.La.1962). The value of "found" is, of course, not included. Also, the wage advances given are void as a matter of law and public policy, *The Sonderborg,* 47 F.2d 723, 728–729 (4th Cir. 1931), and cannot be deducted from any wage award. We do, however, reject a claim for double wages pursuant to 46 U.S.C. § 596.

■■■ A crewman has the right to receive two days' pay for every day that wages are withheld if the wages are withheld without sufficient cause. Wages may be withheld for sufficient cause, and even if the wages are later determined to be due and owing no penalty will be imposed. *See Arguelles* v. *U. S. Bulk Carriers, Inc.,* 408 F.2d 1065 (4th Cir. 1969), aff'd. 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971). It is not required that the "sufficient cause" actually be a valid legal defense. *Bender* v. *Waterman S. S. Corp.,* 166 F.2d 428 (4th Cir. 1948). It is only arbitrary or unwarranted conduct that is sought to be penalized. *Glandzis* v. *Callinic,* 140 F.2d 111 (2d Cir. 1944). In the case before us, OSC gave the master of the MICHELE cash money to pay the crew upon reaching Virginia. OSC also paid sums of money to Puamier and some family members of the deceased crewmen after the sinking occurred. In light of these facts we do not find bad faith in not paying the entire month's wages to the three crewmen whose claims are before us. Thus, we deny a request for the invocation of the statutory penalty.

■■■ Puamier is entitled to receive maintenance and cure at the rate of $8.00 per day. *See* Norris, *The Law of Seamen,* § 607 pp. 154–156. The evidence shows that Puamier entered the care of a physician on November 7, 1972, and was not declared fit for duty until twenty-eight days later on December 5, 1972. It is immaterial whether or not all of this time was actually spent in a hospital as long as Puamier was still recovering from injuries related to his service aboard the MICHELE. *See Morewitz* v. *S. S. Matador,* 306 F.2d 144, 147 (4th Cir. 1962). Although attorneys' fees can be granted in suits seeking maintenance and cure, since these claims are such a small part of this overall suit, attorneys' fees would be inappropriate in this case. *Vaughan* v. *Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

■■■ OSC is also responsible for the burial expenses incurred by the estates of Rodriguez and Belshaw. *Greene* v. *Vantage Steamship Corp.,* 466 F.2d 159, 167 (4th Cir. 1972).

■■■ Finally, we deny all claims for lost gear that was the personal property of the three plaintiffs. No loss has been proven, and we will not speculate as to what each individual lost and its value without more from counsel than the mere assertion that some unnamed personal property went down with the MICHELE. It would be improper to just pick a figure out of the air and assign that value as the loss to each plaintiff.

■■■ As to all awards made to Puamier and the personal representatives of Rodriguez and Belshaw, it is the Court's ruling that Michael Zapetis is not personally liable for these awards. These three crewmen at all times looked to OSC as their employer, and not to Zapetis personally. *West Marine Resources Comm'n,* 330 F.Supp. 966, 968 (E.D.Va.1970). Absent any fraud or injustice we find no reason to impose personal liability. *Trexler* v. *Tug RAVEN,* 290 F.Supp. 429, 441 (E.D.Va.1968).

### III

The third issue facing the Court is Frank Brawley's salvage claim of $53,101.81. Bound up in this issue are the considerations of which corporation, if any, is liable, and if anyone is to be held personally liable.

■■■■ There are two types of salvage, voluntary (or pure) salvage, and

contractual salvage. Norris, *The Law of Salvage,* § 159 at 260 (1958). Voluntary salvage is the rescue of a vessel, cargo or persons upon finding them in a position of need or peril. Altruistically, voluntary salvage is performed merely because a need exists. This voluntary salvage does not go unrewarded, however, except in certain instances of life salvage. The salvors are rewarded by the federal court sitting in admiralty, and the salvage award given is based on the service performed and the danger undertaken. *See The Blackwall,* 77 U.S. (10 Wall.) 1, 13, 19 L.Ed. 870 (1869); *Mason v. The Ship Blaireau,* 6 U.S. (2 Cranch.) 240, 2 L.Ed. 266 (1804). Whatever is salvaged is still the property of the original owner, but he owes whatever salvage award the Court thinks is proper.

■ On the other hand, contractual salvage sets the consideration between the parties, and the courts will not normally interfere with such an agreement. *The Elfrida,* 172 U.S. 186, 19 S.Ct. 146, 43 L.Ed. 413 (1898). The normal contract rules apply, however, and a court will not enforce a contract made under fraudulent representations or duress. *The Elfrida, supra.* The parties may set whatever requirements they desire, but in any event, it is the burden of the party against whom enforcement is sought to prove that the contract is invalid. In the case before us, no party has made even the bare assertion of invalidity, and we do not consider that issue. We also do not question whether the amount sought is reasonable, since no party has challenged the propriety of Brawley's bill. The only question before us is who shall be held liable.

Brawley asserts that because Zapetis purported to represent not only OSC, but OTC and GMC as well, then OTC, GMC, and OSC are liable on the salvage contract. Brawley supports this by arguing that since all three corporations stood to benefit from the salvage operation they should be liable. Brawley also argues that Zapetis should be held personally liable because of his disregard for the OSC corporate entity.

■ At this point a distinction must be noted. Barge BT 1793 was actually salvaged by Brawley, and this work stands in a different light from his attempted salvage of the MICHELE, which never was successful. *See Merritt & Chapman Co. v. United States,* 274 U.S. 611, 613, 47 S.Ct. 663, 71 L.Ed. 1232 (1927). Before we arrive at Brawley's right to recover under the contract of salvage, we note that he has an independent right to recover against the owner, GMC, on the traditional notion of a voluntary salvage of a distressed vessel.[9] It is clear that absent any question of a salvage contract, Brawley would have a right of recovery against the owner for whatever property was actually salvaged. *United States v. Cornell Steamboat Co.,* 202 U.S. 184, 194, 26 S.Ct. 648, 50 L.Ed. 987 (1906). This would extend to the Barge but not the Tug. We can see no reason to have this right defeated merely because there is a separate and independent contract with OSC.

■ In setting an appropriate award for Brawley's salvage of the Barge, we have looked at all the relevant factors. *The Blackwall,* 77 U.S. (10 Wall.) 1, 13, 19 L.Ed. 870 (1869); *The Shreveport,* 42 F.2d 524, 534 (E.D.S.C. 1930). Only the day before she sailed, the Barge was given an assessed value of $125,000.00. Since the seas were still somewhat rough, we note that there was some hazard involved for Brawley and his crew. Further, due to the circumstances prevailing at that time, the Barge had to be towed in backwards. This method creates a less stable tow and requires more care than usual. We

9. We are of the opinion that this was a true salvage and not a mere towage, the latter entitling one to less recovery. See Basic Boats, Inc. v. United States, 352 F.Supp. 44 (E.D.Va.1972). See also Norris, The Law of Salvage, § 16–18 (1958).

find that an award of $5,500.00 is reasonable. After the expenses of the salvage operation are paid for (rental of the minesweeper, etc.), one-half of the remainder shall go to Brawley for being responsible for the operation, and the other half shall go to the crewmen who participated in the salvage of the Barge.

■■ Returning to the contractual salvage question, the Court decides rather summarily that OTC and GMC are not liable on any contract made between OSC, Zapetis as President, and Brawley. Assuming that Zapetis did tell Brawley that he represented not only OSC, but OTC and GMC as well, neither corporation cloaked Zapetis with any authority, either actual or apparent, that would make them liable to Brawley. Further, neither OTC nor GMC took any actions that could be interpreted as a ratification of Zapetis' actions. In fact, when Brawley eventually did contact OTC, Max Larsen denied any participation in the OSC–Brawley contract and referred Brawley to OTC's counsel. Brawley's contractual claim against OTC and GMC cannot lie.

■■ We also reject the argument that OTC and GMC should be liable because they stood to benefit from a successful salvage operation. Had Brawley been successful in raising the MICHELE he would have had a right of recovery against GMC. However, to hold GMC and OTC liable for an unsuccessful salvage merely because they stood to benefit upon success would be to rewrite the law of salvage. Absent any contractual bond between GMC, OTC and Brawley, Brawley can only recover upon actual success, and then only against the owner. *United States* v. *Cornell Steamboat Co., supra.*

■■ In regard to OSC, we find that there was a binding contract. OSC has not challenged either the validity of the contract or the amount sued for. The primary issue, to counsel for OSC and Zapetis, is whether Zapetis is to be held personally liable. Accordingly, we find OSC liable for the amount of $53,101.81,

and turn to the issue of Zapetis' personal liability. For the reasons given below, we find that Zapetis is to be held personally liable.

■■ The general rule is that the corporate entity should be upheld unless specific, unusual circumstances call for looking beyond the corporate structure. *Anderson* v. *Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 88 L.Ed. 793 (1944); *Taylor* v. *Standard Gas Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); *Zubik* v. *Zubik,* 384 F.2d 267, 273 (3d Cir. 1967), *cert. denied,* 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968); *Trexler* v. *Tug RAVEN,* 290 F.Supp. 429 (E.D.Va.1968); *Brown* v. *Margrande Compania Naviera, S. A.,* 281 F.Supp. 1004 (E.D.Va.1968). In *Brown* the Court stated that:

> A corporation is an entity separate and apart from its stockholders and officers, and persons controlling it. *Terry* v. *Yancey,* 344 F.2d 789 (4th Cir. 1965) [other citations omitted]. Mere ownership by one individual of all of the stock does not make that individual the corporation. *Terry* v. *Yancey, supra* [other citations omitted]. There must be something more than identity of officers and stock ownership in corporate set-ups in order to disregard the corporate fiction. It must appear it was organized for a fraudulent purpose or that some injury has resulted to someone from the transaction, something of fraud, something of illegality or wrongdoing, or something where the moving party has cause for complaint in connection with the transaction. [citations omitted]. *Brown,* 281 F.Supp. at 1005–1006.

*See also Zubik* v. *Zubik, supra* at 273; *Trexler* v. *Tug RAVEN, supra,* at 441. The burden is necessarily on Brawley to prove that good reasons exist for piercing the corporate identity of OSC and holding Zapetis personally liable. We believe he has carried that burden.

■■ There are two facts which lead to this conclusion, either one of

which would be sufficient to hold Zapetis personally liable. The first is the misrepresentation by Zapetis to Brawley that OSC owned the Barge and would put it up as security for the expenses generated in salvaging the MICHELE. The Barge was of considerable value, and had Zapetis told the truth, Brawley might have acted differently. At the time Zapetis offered the Barge as security he knew that OSC had no material assets other than some accounts receivable.[10] Had Zapetis told Brawley of this, a bond or a deposit might have been required, or Brawley might have refused to undertake the costly salvage of the MICHELE. We are of the opinion that Zapetis made the representation of ownership with the specific intent that it would influence Brawley into immediately beginning the salvaging of the MICHELE so OSC could complete its Navy hauling contract on time.

Counsel urges that since Zapetis acted in good faith we should not hold him liable. The good faith argued for is that when Zapetis pledged the Barge he fully expected that GMC would stand behind him. We feel that Zapetis' good faith is immaterial. Although quite different on the facts, in a case involving going behind the corporate identity, the Supreme Court stated that good faith was irrelevant as long as the parties intended to do what they did. *Anderson* v. *Abbott,* 321 U.S. 349, 365–366, 64 S.Ct. 531, 88 L.Ed. 793 (1944). The principle is applicable in the case before us. If good faith were to become a defense in actions of this type, every defendant would claim good faith of some sort even though he did exactly what he intended to do in misrepresenting certain facts to an innocent party. This is not an action for common law misrepresentation in which scienter must be proven. That distinction must be made. The corporate identity can be pierced to pre-

vent not only fraud, but any injustice. *Zubik* v. *Zubik, supra,* at 273; *Trexler* v. *Tug RAVEN, supra,* at 441. OSC was responsible for the MICHELE as a bareboat charterer, and had every right to contract for salvage of her, but to allow Zapetis to base the contract on a security agreement in property to which he did not hold title would be to allow a gross injustice.

Secondly, while there is no law against it, we are suspicious of the fact that Zapetis was the sole or primary stockholder in numerous corporations. It appears that, while each corporation may have had some legitimate business dealings, Zapetis brought them into play as shields for his personal dealings. This is clearly improper. *See Annot.,* 46 A.L.R.3d 428 (1972); 19 *Am.Jur.*2d, Corporations § 715 (1940). The one instance of this in the record is Zapetis' use of Ship Sales Corp. to relieve him of some of the difficulty in which OSC found itself. When Brawley presented his bill, OSC, through Zapetis, refused to pay. Brawley was in the position of needing the $53,101.81 to pay his creditors, and not having sufficient funds to legally prosecute his claim. Zapetis brought in the Ship Sales Corp., which had no interest in the case at all, and had it agree to lend Brawley money to prosecute his claim in return for 50% of whatever Brawley recovered. A total of $500.00 was loaned. What we have, then, is Zapetis, through OSC, wrongfully inducing Brawley to go thousands of dollars in debt to recover the MICHELE, and then Zapetis, through Ship Sales, taking advantage of Brawley's bind by inducing him to give up 50% of his recovery—a recovery that would be had against OSC. The result, were this Court to support it, would be unconscionable. Only by imposing personal liability can we cut through the highly questionable practices of Zapetis.

---

10. While we do not consider the question of whether the corporate veil could be pierced because of OSC's possibly undercapitalized state, we note that undecapitalization can be grounds for holding individual parties re-

sponsible. See Arnold v. Phillips, 117 F.2d 497 (5th Cir.), cert. denied, 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539 (1941); Annot., 63 A.L.R.2d 1051 (1959). OSC is now defunct.

## CONCLUSION

GMC was the owner of the MICHELE when she left Miami, and owes OTC the balance of $105,000 on the purchase price.

There was negligence involved in sending the MICHELE out towing Barge BT 1793 in an area where rough seas were a common and usual winter occurrence. It was also negligent not to equip the MICHELE with a longer tow rope. Both of these resulted in the MICHELE being unseaworthy.

Limitation of liability is not allowed because the defects either were known or should have been known. OSC, as a demise charterer, is ultimately liable.

Damages, unpaid wages, burial expenses, lost future wages, and maintenance and cure are awarded in the amounts set out in the Appendix.

OSC is contractually liable to Brawley in the amount of $53,101.81, and Michael Zapetis is personally liable to Brawley for that amount. OTC and GMC are not liable on the contract of salvage. GMC is liable to Brawley for the salvage of Barge BT 1793 in the amount of $5,500.-00.

All arguments not specifically discussed in this opinion, and they are numerous, are denied as being without merit.

### APPENDIX

Puamier (Civil Action No. 12–73–N)

| | |
|---|---|
| Wages—1 month | $400.00 |
| Maintenance and cure—28 days at $8.00 | $224.00 |
| Pain, suffering, etc. | $10,000.00 |
| | $10,624.00 |

Rodriquez (Civil Action No. 13–73–N)

| | |
|---|---|
| Wages—1 month | $400.00 |
| Funeral expenses | $1,372.00 |
| Pain and suffering and lost future earnings, etc. | $50,000.00 |
| | $51,772.00 |

Belshaw (Civil Action No. 14–73–N)

| | |
|---|---|
| Wages—1 month | $750.00 |
| Funeral expenses | $450.00 |
| Pain and suffering and lost future earnings, etc. | $75,000.00 |
| | $76,200.00 |